Billie ALEXANDER and Barbara Alexander, on their behalf and on behalf of all others similarly situated, as parents and next friends of, Dyan Alexander and Timothy Alexander, minor children, Plaintiffs,

v.

Joseph A. CALIFANO, Jr., Individually and as Secretary of the Department of Health, Education and Welfare, et al., Defendants.

No. C-76-1982-WWS.

United States District Court, N. D. California.

May 17, 1977.

David M. Krashna, Contra Costa Legal Services Foundation, Richmond, Cal., Norman J. Chachkin, Federal Ed. Project, etc., Washington, D. C., Jan T. Chilton, Severson, Werson, Berke & Melchior, San Francisco, Cal., for plaintiffs.

John J. Klee, Jr., Joanne Condas, Deputy Atty. Gen., San Francisco, Cal., Russell W. Taylor, Haims MacGowan & McInerney, Oakland, Cal., William B. Spohn, Senior Asst. U. S. Atty., San Francisco, Cal., for defendants.

## ORDER GRANTING PARTIAL SUMMARY JUDGMENT

WILLIAM W SCHWARZER, District Judge.

This is an action to enforce rights asserted by plaintiffs under Title I of the Elementary and Secondary Education Act of 1965, as amended, (20 U.S.C. Secs. 241a et seq.) ("Title I") and regulations issued thereunder. This Court has jurisdiction under Sections 1331 and 1343, Title 28, United States Code.

Plaintiffs allege that they are low-income residents of Richmond, California, and that the minor plaintiffs are educationally deprived children requiring special educational assistance. They sue in their own behalf and on behalf of a class of other educationally deprived children and their parents residing in areas within the Richmond Unified School District ("RUSD") eligible to receive so-called Title I assistance. Although no motion has been made under Rule 23(c)(1), Federal Rules of Civil Procedure, for a determination that the action may be maintained as a class action, no question has been raised by defendants in this regard and the record on this motion amply supports a finding that this action meets the requirements of paragraphs (a) and (b)(2) of Rule 23. Accordingly, the Court finds that, at least with respect to the issues determined on this motion, the action may be maintained as a class action.

The complaint raises, among other issues, an issue concerning the lawfulness of the method used by RUSD in allocating and distributing to various schools funds received from federal and State sources for compensatory educational programs.[1]

---

1. The term "compensatory education" is used in the opinion to describe programs and projects intended to assist educationally deprived children, whether allocated on the basis

Cross-motions for partial summary judgment on that issue have been filed and the parties agree that there is no genuine issue of material fact precluding disposition by summary judgment.

For the reasons hereafter discussed, the Court finds and concludes that plaintiffs are entitled to partial summary judgment awarding them declaratory relief against the method used by RUSD to allocate and distribute State compensatory education funds to schools eligible to receive federal Title I aid.

## I.

A. Title I makes available federal "financial assistance . . . to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means . . . which contribute particularly to meeting the special educational needs of educationally deprived children." (20 U.S.C. Sec. 241a.)

An application for Title I funds by a local educational agency ("LEA") such as RUSD must be approved by the appropriate State educational agency which must determine that the LEA has met certain requirements. Among other things, the State agency must determine that

"Federal funds made available under this subchapter will be so used (i) as to *supplement* and, to the extent practical, increase the level of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter, and (ii) in no case, as to *supplant* such funds from non-Federal sources . . ." (20 U.S.C. Sec. 241e(a)(3)(B); emphasis added.)

The question presented is whether the method used by RUSD, acting under regulations and directives of the State Department of Education, to distribute and allocate federal Title I funds among certain of its schools violates the statutory requirements quoted above. Specifically, the question is whether RUSD, by pooling State and federal funds and allocating a flat sum per eligible pupil, has used federal funds to supplant rather than to supplement available State funds.

B. State funds are made available to RUSD under a compensatory education program known as the Educationally Disadvantaged Youth Act. Inasmuch as it was initially enacted in 1972 as part of Senate Bill 90, it is generally referred to as SB 90/EDY. (Cal.Ed.Code Secs. 6499.230–6499.238.) California also has a program of categorical aid funds known as the Early Childhood Education program ("ECE".) (Cal.Ed.Code Secs. 6445–6446.6.) While there are differences in these programs, for purposes of the discussion here, ECE funds may be treated as being included within the SB 90/EDY allocations to the extent they also went to educationally disadvantaged children.

Under the SB 90/EDY program, RUSD must rank its school attendance areas (i. e., schools) according to educational need, determined on the basis of the number of students scoring in the lowest quartile on statewide standardized tests. 5 Cal.Ad. Code Sec. 3934(c). The available SB 90/EDY funds are then distributed among the district's schools in order of rank.

The amount of SB 90/EDY funds, as well as Title I funds, received by each eligible school, is determined by the district. In making that determination, the district is bound by guidelines issued annually by the State Superintendent of Public Instruction.[2]

---

of low income or substandard performance on scholastic tests. Unless otherwise specified, it includes both federal funds and so-called categorical aid provided by the State.

**2.** The criterion for setting the guidelines is found in Section 3932 of Title 5, Cal.Admin. Code, which states:

3932. *Minimum and Maximum Levels of Service.* For each student receiving services under ESEA, Title I or the Educationally Disadvantaged Youth Program, the district shall

Those guidelines establish the maximum and minimum amount of compensatory education funds from all sources which may be spent by the district per eligible pupil. For the 1976–1977 school year, the maximum was set at $550 per pupil, the minimum at $350 per pupil. The district was left free to select any figure within that range as its per pupil expenditure of compensatory education funds. RUSD set the figure at $400 per pupil.

Had RUSD distributed the SB 90/EDY funds available to it to the schools eligible to receive such funds in the order of their SB 90/EDY ranking, and without regard to available Title I funds, at the rate of $400 per pupil, it would have run out of those funds (even after adding to them ECE funds available to the same schools) before reaching the thirteenth ranked school. Even had it distributed only the minimum of $350 per pupil, these funds would not have extended beyond the fourteenth ranked of the eligible schools.[3]

Instead of following the above procedure, RUSD pooled its SB 90/EDY funds with its Title I funds. It then allocated Title I funds among Title I eligible schools, using SB 90/EDY funds in relatively small amounts as needed to bring the aggregate allocation to the level of approximately $400 per pupil. For Title I purposes, schools must be ranked on the basis of the ratio or number of their students coming from low-income families. See, 45 C.F.R. Sec. 116a.20(b), (d), (g), (h). Inasmuch as the Title I eligible schools were apparently also eligible under SB 90/EDY, the result of this process was to stretch the SB 90/EDY funds among a larger number of schools than would otherwise have received them. Instead of exhausting those funds at the thirteenth-ranked school, RUSD was thus able to provide compensatory education funding at the $400 per pupil level from either State or federal sources to all twenty-five schools shown in footnote 3.[4]

Plaintiffs argue that by this method of allocation, RUSD used federal funds to supplant, rather than to supplement State funds, in violation of the act. They contend, and the Department of Health, Education and Welfare ("HEW") concurs, that State funds should have been allocated first and federal Title I funds layered on top, thereby concentrating the available educational assistance on those pupils needing it the most, i. e., pupils in schools which rank

verify an average expenditure per student of an amount under such programs determined annually by the Superintendent of Public Instruction. Such amount shall not be less than 30 percent of the average per student expenditure excluding categorical funds in schools in California nor more than 60 percent of this average.

3. The following table lists the RUSD schools in the order in which they are ranked for State SB 90/EDY purposes (i. e., on the basis of student performance on standardized tests). The third column shows each school's ranking for Title I purposes (i. e., based on the number of low-income families among its pupils).

| School | SB 90/EDY Rank | Title I Rank |
|---|---|---|
| Verde | 1 | 2 |
| Cortez | 2 | 1 |
| Lincoln | 3 | 5 |
| King | 4 | 8 |
| Peres | 5 | 3 |
| Belding | 6 | 16 |
| Nystrom | 7 | 4 |
| Coronado | 8 | 7 |
| Stege | 9 | 11 |

| School—Cont'd | SB 90/EDY Rank—Cont'd | Title I Rank—Cont'd |
|---|---|---|
| Lake | 10 | 9 |
| Woods | 11 | 6 |
| Dover | 12 | 10 |
| Bayview | 13 | 15 |
| Fairmede | 14 | 24 |
| Grant | 15 | 22 |
| El Portal | 16 | 14 |
| Ford | 17 | 13 |
| Broadway | 18 | 20 |
| Vista Hills | 19 | 31 |
| Washington | 20 | 12 |
| Alvarado | 21 | 21 |
| Riverside | 22 | 19 |
| Wilson | 23 | 25 |
| Rancho | 24 | 17 |
| Montalvin | 25 | 18 |
| Balboa | 26 | 23 |
| Kerry Hills | 27 | 36 |

4. Plaintiffs point out, in this connection, that as a result of this method of allocation, seven low-ranked SB 90/EDY schools, not eligible for Title I funds, with 1,362 participating students

high under both the State scholastic standard and the federal low-income standard.

## II.

Title I was initially adopted in 1965. Its basic purpose was to provide federal funds to help meet the needs of educationally deprived children in school attendance areas of districts having high concentrations of children from low-income families. (See, 1965 U.S.Code Cong. and Admin.News, pp. 1446, 1454.) Grants were to be determined with reference to and were to supplement the average expenditures per pupil in the state. (Id., at p. 1451.)

Experience under the act led to various complaints concerning its administration and enforcement, including complaints that federal Title I funds were being used to supplant State and local funds. (1970 U.S. Code Cong. and Admin.News, pp. 2768, 2776.) As a result, Congress in 1970 adopted, among various other amendments to the act, the present language of Section 241e(a)(3) which requires the appropriate State educational agency to make a determination that

"(B) Federal funds made available under this subchapter will be so used (i) as to supplement and, to the extent practical, increase the level of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter, and (ii) in no case, as to supplant such funds from non-Federal sources, and (C) State and local funds will be used in the district of such agency to provide services in project areas which, taken as a whole, are at least comparable to services being provided in areas in such district which are not receiving funds under this subchapter . . ."

Senate Report No. 91–634 comments on the purpose of those provisions as follows:

representing 20.3% of the students participating in RUSD's compensatory education pro-

## "SUPPLANTING STATE AND LOCAL FUNDS WITH FEDERAL FUNDS

"Under present law there is no specific prohibition against supplanting State and local funds with Federal funds even though supplanting would be inconsistent with the theory of title I. Title I funds are intended to be supplementary to the education program generally offered by the States and local educational agencies. The amendment made by section 109 would make clear that supplanting is prohibited and that State and local funds will be used to provide services for title I children which are at least comparable to the services provided to children who are not participating in title I programs. Subsection (b) of section 109 makes clear that the addition of the 'no supplanting' clauses should not be construed to [sic, as] authorizing supplanting prior to the effective date of the amendment.

"The committee wishes to point out that the language of the proposed clause (C) of section 105(a)(3) is intended to be a statement of prohibition against a type of supplanting which audit reports indicate has been the practice in some cases. Clause (C) does not require the expenditure of equal amounts of State and local funds on all children. However, in enforcing clauses (B) and (C) of section 105(a)(3), the Commissioner is expected to look to the services available to children in title I projects compared with services available to children outside project areas, and hold State and local educational agencies responsible for determining comparability of services and expenditures, and emphasize substantial equivalence in such matters as pupil-staff ratios, available courses and services, and average teacher compensation." (1970 U.S.Code Cong. and Admin.News, pp. 2781–2782.)

In 1974, Congress adopted a further amendment in an effort to clarify the purpose for which an LEA may receive a grant under the act. As initially adopted, the act authorized such a grant upon determination by the appropriate State educational agency that

gram, receive more than 35% of all SB 90/EDY funds received by RUSD.

"payments . . . will be used for programs and projects . . . designed to meet the special educational needs of educationally deprived children in school attendance areas having high concentrations of children from low-income families . . ." (20 U.S.C. Sec. 241e(a)(1).)

The 1974 amendment provided that such

"payments . . . will be used for the *excess costs* of [such] programs and projects . . ." (emphasis added.)

It further defined "excess costs" as costs directly attributable to programs and projects which exceed the average per pupil expenditure of an LEA but, at the LEA's option, not including

"expenditures for any comparable State or local special programs for educationally deprived children . . ." (20 U.S.C. Sec. 244(17).)

House Report No. 93–805 contains the following comment respecting these amendments:

"Excess Cost

"The Committee bill also amends the section of the law authorizing Title I activities to reemphasize that Title I funds are to be used solely for paying the excess costs of educational programs. This means that Title I funds are not to be used to supplant local and State funds which may be available for the same or similar activities.

"The same amendment by defining 'excess cost' to exclude State and local spending on programs for the handicapped, bilingual education programs, and compensatory education programs also affects the comparability requirement under Title I. Local school districts—at their option—may thereby delete expenditures for these purposes from their computations in determining whether their State and local expenditures on education are at least the same in Title I schools as in noneligible schools. The

purpose of this amendment is to encourage State and local spending on programs for the handicapped, for the educationally deprived, and for those with limited English-speaking ability, and not to deny them Title I funds if they are using non-Federal funds for those purposes." (1974 U.S.Code Cong. and Admin.News, pp. 4108–4109.)

The question before the Court is whether these provisions prohibit an LEA, acting under regulations of the State educational agency, from allocating State and federal compensatory education funds on a pooled basis, rather than allocating State funds without regard to the available federal funds.

### III.

■ At the outset, it should be noted that no claim is made here that State compensatory education funds were supplanted in the sense that State funds available to RUSD were reduced by reason of the availability of Title I funds.[5] The claim is simply that pupils in some RUSD schools eligible for both types of funds received a lesser amount of State funds than they would have received had the funds been independently allocated; as a result, some of the available State funds went to RUSD schools that would otherwise have received none.

Neither the language of the act, nor the legislative history of the amendments discussed above, provides a direct answer to the question whether this method of allocation violates the prohibition against supplanting.

But Congress did use what appear to be carefully chosen words in its 1970 amendment when it required that Federal funds be used so as

"to the extent practical, increase the level of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs

5. An illustration of this more conventional method of supplanting is found in *Nicholson v. Pittenger,* 364 F.Supp. 669 (E.D.Pa.1973), where the school district had used Title I funds to finance art, music and reading programs in Title I schools while providing the same programs in other schools with State and local funds.

and projects assisted under this subchapter, and (ii) in no case, as to supplant such funds from non-Federal sources . . ."

The present controversy appears to come squarely under this provision. In the absence of federal funds, State funds of not less than $350 per pupil would have been available for the education of a number of pupils participating in Title I programs. Under RUSD's allocation method, federal funds are not used to increase the level of funds available to these pupils; instead, the amount of State funds available to Title I pupils is reduced, with the resulting excess going to other pupils. On the face of it, the allocation method therefore violates Section 241e(a)(3).

The State and local defendants argue that Congress, in adopting the recent amendments to the act, meant to encourage rather than discourage State categorical aid programs, that an interpretation compelling allocation of State aid to children already receiving federal aid would serve as a disincentive to State programs, and that, therefore, in applying the supplanting prohibition, State compensatory education funds (as opposed to general State and local funding) should be excluded. While defendants may be correct as a matter of policy and politics, the language of the act does not support their argument. For it is clear that when Congress meant to have State and local compensatory education funds receive consideration different from that accorded other expenditures on education, it knew how to articulate that distinction.

The distinction between these two types of educational funding is made in two provisions of the statute. It appears first in Section 241e(a)(1) which specifies the purpose for which Title I assistance may be used. Under the terms of the 1974 amendment, LEA are to use Title I funds to finance the *excess cost* of programs for educationally deprived children. In determining what are excess costs, the LEA, under Section 244(17), may now use as the base its average per pupil expenditure, but need not include State or local funds spent on programs for educationally deprived children. By excluding the cost of these special programs from base costs, the amount of excess cost funding available under Title I is not decreased by reason of the availability of State and local funds for compensatory education, thus removing any disincentive against providing such funds.

The distinction is made again in connection with the requirement under Section 241e(a)(3) which requires that services provided with State and local funds in schools receiving Title I funds be at least comparable to services in non-Title I schools. To the extent that comparability is tested by comparing per pupil expenditures in Title I and non-Title I schools, Section 244(17) permits the LEA to exclude from the comparison the cost of compensatory education programs.[6]

The foregoing analysis strongly suggests that had Congress intended to exclude State and local funds for compensatory education from the supplanting prohibition, it could readily have said so. That it did not intend to do so by adopting the excess cost amendment is reflected in the statement in House Report No. 93–805. That statement shows that Congress meant to liberalize the comparability tests only; it discussed the exclusion of State compensatory education funds only in connection with comparability—when it addressed the matter of supplanting, it said only that it wished to "reemphasize . . . that Title I funds are not to be used to supplant local and State funds *which may be available for the same or similar activities.*" (Emphasis added; see, p. 7, above.)

---

**6.** See the discussion of the effect of the excess cost amendment on the comparability requirement in House Report No. 93–805, quoted at p. 7, above. See, also the ranking of schools in footnote 3, above, which indicates that some schools ranking high under SB 90/EDY standards rank low under Title I standards and thus may receive aid under the former but not the latter program. And see the discussion of HEW's comparability regulation (45 C.F.R. Sec. 116a.26(j)(5)) at p. 12, below.

■ What all this seems to mean is that, in meeting the eligibility standards for Title I aid, State and local agencies are not to be penalized for making available funds for compensatory education programs; children eligible for Title I aid are not for that reason to receive less than they would otherwise be entitled to receive under *any* State or local program.

One may well differ, as a matter of educational policy, with the legislative choice to concentrate rather than spread aid among educationally deprived children, but that is not a matter for this Court. There is no necessary incongruity about the legislative choice nor is there, as defendants claim, conflict between the act and the regulations. The current regulations implementing Section 241e(a)(3) state without qualification that the use of Title I funds may "not result in a decrease in the use (for educationally deprived children) of State or local funds which, in the absence of funds under Title I, would be made available for the education of such children, and that *such children will not otherwise be penalized in the application of State and local funds because of such a use of funds under Title I.*" The regulation goes on to state that Title I funds must be "used to supplement, and to the extent practical, increase the level of State or local funds *that would, in the absence of such Federal funds, be made available for the education of pupils participating in that project . . .*" (45 C.F.R. Sec. 116.40(a) and (b), emphasis added.) Without question, a number of RUSD children eligible for SB 90/EDY aid are penalized in the sense that they receive less from that program than they would receive from it in the absence of federal Title I funds.[7]

The State and local defendants point to Section 116a.20(c)(1) which requires that no project area (i. e., school) receive Title I funds unless all project areas with a higher ratio or number of children from low-income families are designated to receive such funds *or* have been designated to receive services of the same nature or scope as would be provided with Title I funds through the use of funds from other sources. (45 C.F.R. Sec. 116a.20(c)(1).) But all that this regulation means is that Title I funds may be supplanted by State or local funds, not the reverse.

The State and local defendants also rely on Section 116a.26(j)(5) of the regulations which permits the LEA, at its option, to exclude "State and local funds expended for . . . programs similar to programs provided under Title I for educationally deprived children . . . *from determinations under this section.*" 45 C.F.R. Sec. 116a.26(j)(5), emphasis added.) But this section deals with comparability determinations pursuant to Sec. 241e(a)(3)(C), not with supplanting determinations under Sec. 241e(a)(3)(B) which are covered by Secs. 116.40(a) and (b), quoted above. It is obviously significant (as heretofore discussed) that the exclusion made for comparability purposes is not made for supplanting purposes.

Finally, the State and local defendants stress that Congress intended to leave it to State and local authorities to devise programs and projects which met their peculiar needs, rather than to preempt the direction and control of Title I programs. There is no question that this is true, as the legislative history accompanying the 1965 enactment and the subsequent amendments clearly shows.[8] But it is also true that

---

7. The HEW, in the administration of Title I, has interpreted the supplanting provision as applying to compensatory education funds as well as other funds is confirmed by *Appeal of the State of Nebraska Title I, ESCA,* Docket No. 8–(10)–74, an HEW administrative appeal, where the Title I Audit Hearing Board found that Nebraska had violated the supplanting prohibition by using Title I money to pay the salaries of special education personnel who worked with

mentally handicapped children where state money was available to finance these projects.

8. "It is the intention of the proposed legislation not to prescribe the specific types of programs or projects that will be required in school districts. Rather, such matters are left to the discretion and judgment of the local public educational agencies since educational needs and requirements for strengthening educational opportunities for educationally deprived elemen-

Congress intended to achieve a particular purpose and shaped the act to insure that federal funds would be used in a manner consistent with that purpose:

"Under the terms of the legislation, a local public school district may use funds granted to it for the broad purpose of programs and projects *which will meet the educational needs of educationally deprived children in those school attendance areas in the district having high concentrations of children from low-income families.*" (S.Rep.No.146; 1965 U.S.Code Cong. and Admin.News, p. 1454; emphasis added)

"[I]n enacting Title I, Congress did not place the full force of the Federal Government behind a particular method of education—the legislation left to local schools the decision as to what education methods are to be used in improving educational opportunities for educationally deprived children.· However, the legislation does contain administrative procedures and evaluation and reporting requirements which are designed to insure that, whatever education methods are used, Federal funds are to be focused on the special educational needs of educationally deprived children . . ." (S.Rep.No.91–634; 1970 U.S.Code Cong. and Admin.News, p. 2775)

That the enforcement of the federal requirement is likely to have an impact on State and local programs and may require changes in State regulations and guidelines is not a ground for disregarding that requirement.[9] Nor is the wisdom of the policy to concentrate compensatory education funds on a small number of pupils a matter for the Court's consideration.

The Court, for the reasons stated above, is compelled to declare that RUSD's method of allocating and distributing State SB 90/EDY funds to Title I project areas, under which the amount which would otherwise be allocated and distributed to a project area is reduced by reason of the availability of Title I funds, violates the requirements of Section 241e(a)(3)(B) of Title 20, United States Code. The Court renews its recommendation that the parties apply their best efforts toward resolution of their differences to minimize costly litigation.

The Court will hold a status conference to determine the course of further proceedings in this action on June 24, 1977, at 11:30 A.M.

IT IS SO ORDERED.

---

tary and secondary school pupils will vary from State to State and district to district." S.Rep.No.146, 1965 U.S.Code Cong. and Admin.News, p. 1454.

\* \* \* \* \* \*

"Generally, initiative and discretion are vested at the local level or the State level, preserving with the persons served, the opportunity to use Federal assistance in imaginative ways to meet particular needs in each eligible community." S.Rep.No.91–634, 1970 U.S.Code Cong. and Admin.News, p. 2772.

9. Cal.Ed.Code Sec. 551 states that "The people of the State of California accept the provisions of, and each of the funds provided by, the act of Congress entitled . . . " Elementary and Secondary Education Act of 1965. See also, Cal.Ed.Code Sec. 6456.