**STATE OF CALIFORNIA and Beverlee Myers in her capacity as Director of the State Department of Health Services, Plaintiffs-Appellants,**

v.

**Norval D. SETTLE, et al., Defendants-Appellees.**

No. 82–4481.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 16, 1983.

Decided June 17, 1983.

---

Ellen J. Sazzman, Dept. of Justice, Allan Gnessin, Dept. of Health & Human Services, Washington, D.C., for defendants-appellees.

Elizabeth C. Brandt, Sacramento, Cal., for plaintiffs-appellants.

Before WRIGHT, CANBY, and BOOCHEVER, Circuit Judges.

BOOCHEVER, Circuit Judge:

The Secretary of the United States Department of Health & Human Services recovered payments made to California under the Medicaid program. The payments were the federal share of costs erroneously incurred in the administration of the program. California appealed the recoupment to the Departmental Grant Appeals Board, contending that the Secretary could only recover the federal share of erroneous payments above a tolerance level for unavoidable errors. The Grant Appeals Board upheld the recoupment because the Secretary had not promulgated any regulations establishing such a tolerance level, and the Board refused to establish a tolerance level on a case-by-case basis through adjudication. California sought judicial review, but the district court dismissed the suit because (1) the Board decision was committed to agency discretion and thus was not reviewable, and (2) a court cannot use mandamus to compel an administrative agency to perform a discretionary function, such as adjudication. California now appeals that dismissal. We affirm.

FACTS

Medicaid is a federal-state program providing health care services. Generally, Medicaid pays the doctor or hospital for individual services rendered (called the "fee-for-service" system). Medicaid also authorizes the states to purchase prepaid health care insurance plans. In 1968 California began funding experimental prepaid health plan projects. It began contracting with the plans on a regular basis in 1972.

Under this plan of funding both fee-for-service and prepaid health plans, California made some erroneous duplicate payments for medical services. This happened, for example, where a Medi-Cal recipient for whom the State bought a prepaid health plan went to a doctor not associated with the plan. The payment to the doctor was duplicative because the State had already paid for a health plan which would have provided the health care service. Another example of a duplicate payment occurred when a Medicaid beneficiary moved to a new county and received health care benefits before that county made sure that the old county had stopped prepaid health plan payments. Thus the old county continued to make payments to a health plan while the new county duplicatively paid for the services rendered. The State concedes that the duplicate payments were contrary to the requirements of applicable regulations.

Under the federal-state Medicaid program, the total cost paid by the state is categorized. The federal government then pays specified percentages of the costs incurred in the various categories. For example, the federal government pays different percentages of the costs incurred in such categories as medical assistance, administrative expenses, and amounts expended for the elimination of fraud. 42 U.S.C. §§ 1396b(a)(1), (7), (6) (1976 & Supp. IV 1980).

The California Auditor General reported that some duplicate payments were being made. The Department of Health, Education and Welfare (now Health and Human Services or "HHS")[1] Audit Agency performed a series of audits. The audits resulted in disallowances of federal participation for the period up to July 31, 1977 in the amount of $7,613,820. The figure was subsequently adjusted to $7,561,820.

California appealed the disallowance to the Departmental Grant Appeals Board. California argued that it was entitled to federal financial participation in duplicate payments up to a reasonable level. The State argued that the Secretary could not deny federal participation in all duplicate payments, but had to establish "tolerance levels" for reasonable error either by regulation or by case-by-case adjudication.

The Grant Appeals Board rejected the argument. It held that no regulations existed establishing a tolerance level, and it refused to set such a level by adjudication. The Board thus upheld the disallowance.

The State next brought suit in the federal district court. The district court dismissed the suit. The State appeals the dismissal to this court.

## DISCUSSION

### I.

### No Law to Apply

The first ground that the district court relied upon in dismissing the suit is that the decision of the Grant Appeals Board was unreviewable under the Administrative Procedures Act because there was no law to apply. The Administrative Procedures Act precludes review of agency action "committed to agency discretion by law". 5 U.S.C. § 701(a)(2) (1976). This creates a narrow exception to judicial review, "applicable in those rare instances where 'statutes are

drawn in such broad terms that in a given case there is no law to apply.' " *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (citations and footnote omitted). This language from *Overton Park* has been interpreted to mean that judicial review is available when the plaintiff alleges a violation of "constitutional, statutory, regulatory or other legal mandates or restrictions", but review is precluded when plaintiff's complaint is primarily that the agency made the wrong choice when making an "informed judgment". *Ness Investment Corp. v. United States Dept. of Agriculture, Forest Service,* 512 F.2d 706, 715 (9th Cir. 1975). We believe that this case falls into the latter category.

California asked that HHS establish tolerance levels for duplicate payments either by rulemaking or by adjudication. The Supreme Court has stated that the choice of whether to proceed by rulemaking or adjudication is one that lies primarily in the informal discretion of the administrative agency. *Securities & Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). *See also NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 294–95, 94 S.Ct. 1757, 1771–72, 40 L.Ed.2d 134 (1974). *But see Community Television of Southern California v. Gottfried,* —— U.S. ——, ——, 103 S.Ct. 885, 893, 74 L.Ed.2d 705 (1983) (noting that "rulemaking is generally a 'better, fairer, and more effective' method of implementing a new industry-wide policy than is the uneven application of conditions in isolated" adjudications). The district court found that there was no law to apply in this case because "the Grant Appeals Board applied a number of [practical] factors, rather than law" in deciding not to set a tolerance level by adjudication.[2]

---

1. The Department of HEW was reorganized as the Department of HHS on May 4, 1980. Pub.L. No. 96–88, § 509(b). *See also* 20 U.S.C. § 3441 (Supp. V 1981).

2. *California Department of Health Services, Department of Health and Human Services,*

Departmental Grant Appeals Board Decision No. 389 (Feb. 28, 1983) dealt with identical duplicate payment errors in the California Medicaid program, but for a different time period. In that decision, the Grant Appeals Board noted the practical reasons cautioning against proceeding by adjudication that it had heeded in

The Grant Appeals Board gave three reasons for refusing to set a tolerance level by adjudication, as follows:

° Setting a tolerance level for these errors would require a complicated, after-the-fact construction of an empirical data base concerning claims processing errors and the feasibility of avoiding them.

° The regulatory (or legislative) process is more suitable for determining what a reasonable tolerance would be since this requires expertise and experience in program operations, a comparison of various states' performances, and an evaluation of the feasibility of reducing errors in a cost-effective manner.

° There is no way of determining with mathematical precision the exact point at which a tolerance level should be set, and, while the concept of "reasonableness" may lead to identifying a range within which errors could be tolerated, the choice of a specific figure within that range involves a policy judgment.[3]

The district court was correct in concluding that the Board refused to set a tolerance level based on practical reasons, not legal ones. Therefore, the choice not to adjudicate was an exercise of discretion not reviewable in court.

California argues that there is law to apply constraining the Board's discretion. Three sections of the Medicaid portion of the Social Security Act show that the Secretary could have set tolerance levels if he or she had wanted to. However, these sections do not require the Secretary to set tolerance levels and therefore, there is no law to apply. First, 42 U.S.C. § 1302 allows the Secretary of HHS to make rules and regulations necessary to the efficient administration of the Secretary's duties. This section is totally discretionary. While

arguably it allows the Secretary to promulgate regulations allowing a tolerance level for erroneous payments, it does not mandate that such a level be set. Second, 42 U.S.C. § 1396b(a)(7) calls for federal financial participation "in amounts expended ... *as found necessary by the Secretary for* the proper and efficient administration of the State plan" (emphasis added). The Secretary, however, has never found duplicate payments to be a "necessary" cost of Medicaid administration. Moreover, the State claimed the payments as medical assistance costs, not administrative costs. Finally, 42 U.S.C. § 1396b(a)(1) allows federal financial participation in amounts expended "as medical assistance under the State plan." This also does not require federal participation in duplicate payments, as was explained in the leading case in this area, *Maryland v. Mathews,* 415 F.Supp. 1206 (D.D.C.1976).

*Maryland v. Mathews* involved HEW regulations establishing tolerance levels for erroneous payments made by the states under another section of the Social Security Act, the Aid to Families with Dependent Children program (AFDC). The tolerance levels were set at three percent and five percent for various types of errors. The plaintiffs, several states and a county participating in the AFDC program, contended that federal financial participation in all state payments, including erroneous payments, was required and sought to have the regulation declared invalid. The court held:

(1) "[E]rroneous payments are payments made outside the state plan." 415 F.Supp. at 1212. "From the statutory language, it can be concluded that payments which are not made properly, pursuant to the approved plan, are not to be matched by federal funds." *Id.* This was said in interpreting language of the AFDC act parallel

this case, but went on to analyze the statute, legislative history, and regulatory history. The Board concluded, as we do, that no law required the Secretary to allow federal financial participation in these erroneous payments.

**3.** *California Department of Health Services,* Department of Health and Human Services, Departmental Grant Appeals Board Decision No. 389, at 3 (Feb. 28, 1983), summarizing its earlier decision at issue here.

to 42 U.S.C. § 1396b(a)(1) of the Medicaid act.[4]

(2) Because the elimination of all erroneous payments is unrealistic, a regulation allowing federal financial participation up to a reasonably set tolerance level would be consistent with the Act. The Secretary could promulgate a regulation setting such a tolerance level. 415 F.Supp. at 1212–13.

(3) Any tolerance level set must be reasonable and supported by a factual basis. The three percent and five percent levels were set arbitrarily and without an empirical study. Therefore, the regulation was invalid. 415 F.Supp. at 1213–14.

For our purposes, the *Maryland v. Mathews* holdings are important for two reasons. First, the Secretary has the power to set tolerance levels. Second, the Secretary is not required to set tolerance levels, because erroneous payments are outside the state plan and need not be matched by federal funds.

We agree that nothing in the Social Security Act itself requires the Secretary to set tolerance levels. Nevertheless, California contends that there is law to apply: the Secretary of HHS had previously interpreted the Social Security Act to allow a reasonable tolerance level for erroneous payments in other programs. This contention is made despite California's express concession that there was no regulation establishing a tolerance level for the program and time period in issue.

The parties debate in some detail the history of regulations allowing tolerance levels for various programs under the Social Security Act. It would serve no purpose to repeat that history here. After review, we are convinced that no law exists to constrain the Secretary's discretion. The State's arguments reduce to this: by adopting regulations allowing federal participation in other programs under the Social Security Act, the Secretary was indicating, by negative inference, that all other state payments, including erroneous ones, would be federally funded. This dubious inference is refuted by the provisions of the Act allowing for recoupment of erroneous payments and disallowing federal participation in payments made outside the state plan. 42 U.S.C. §§ 1396b(d)(1)–(3), 1396c (1976). In addition, the opposite inference is at least equally plausible: that the regulations suggest that there would be no federal financial participation in erroneous payments except as specifically provided.

We find that there is no law or agency interpretation of law constraining the agency's discretion. The district court is affirmed in dismissing the case because action on tolerance levels is committed to agency discretion.

## II.

### Mandamus

The State also asked for relief in the form of mandamus to require HHS to adjudicate whether the duplicate payments were within a reasonable level of error. The district court dismissed this claim, stating that a court cannot use mandamus to compel an agency to perform a discretionary function such as adjudication.[5]

Mandamus may not be used to force the exercise of discretion in a particular way. *Wilbur v. United States*, 281 U.S. 206, 218–19, 50 S.Ct. 320, 324, 74 L.Ed. 809 (1930). Where the "duty" alleged involves agency expertise on an issue of judgment and choice, the matter is left to the agen-

---

4. In addition to the statutory language, the court in *Maryland v. Mathews* found that two other sections of the AFDC act supported the interpretation that erroneous payments are not entitled to federal financial participation. 415 F.Supp. at 1212. 42 U.S.C. § 603(b)(2)(B) (1976) of the AFDC act allows the federal government *to recoup its proportional share of* erroneous payments recovered by the state. Similarly, 42 U.S.C. §§ 1396b(d)(1)–(3) (1976) of the Medicaid act provide for this type of recoupment. 42 U.S.C. § 604(a)(2) (1976) of the AFDC act allows for the withholding of a percentage of federal funds if the state has failed to comply substantially with certain duties in the administration of the plan and is deemed to have acted outside the authority of the plan. 42 U.S.C. § 1396c (1976) provides similarly for the Medicaid program.

5. *See* footnote 2, *supra*.

cy's informed discretion, and is not subject to mandamus. *Panama Canal Co. v. Grace Line, Inc.,* 356 U.S. 309, 317–18, 78 S.Ct. 752, 757–58, 2 L.Ed.2d 788 (1958). As we have just explained, the Secretary of HHS was under no mandatory duty to establish tolerance levels, either by regulation or through adjudication. Therefore, because no law constrained the agency's exercise of its discretion, mandamus is not appropriate.

## CONCLUSION

No law or regulatory interpretation requires the Secretary of HHS to allow federal financial participation in duplicate payments up to a reasonable level. The Secretary was free to promulgate such a regulation (which he did not) or to disallow all federal financial participation in duplicate payments.

Therefore, because no law exists to constrain the Secretary's exercise of discretion, the failure to act was unreviewable and not subject to mandamus. The district court is

AFFIRMED.