**DEPARTMENT OF EDUCATION, STATE OF HAWAII, Petitioner,**

v.

**Terrel BELL, Secretary of Education, United States Department of Education, Respondent.**

Nos. 82–7697, 82–7698.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 14, 1985.

Decided Sept. 10, 1985.

Charleen M. Aina, Honolulu, Hawaii, for petitioner.

John R. Mason, Richard B. Mellman, Washington, D.C., for respondent.

Before HUG and SKOPIL, Circuit Judges, and CURTIS,* District Judge.

SKOPIL, Circuit Judge:

The Education Appeals Board ("EAB") found Hawaii violated provisions of Title I of the Elementary and Secondary Education Act of 1965, Pub.L. 89–10, 79 Stat. 27, as amended, 20 U.S.C. § 2701 et seq.

* The Honorable Jesse W. Curtis, Senior United States District Judge for the Central District of

(1976 Supp. V) ("Title I"). The Secretary of Education ("Secretary") demanded that Hawaii repay the Department of Education $2,109,618. Hawaii appeals from the EAB decision, claiming the Secretary misinterpreted and misapplied Title I provisions in determining the validity of the audit conducted by the Health Education and Welfare Audit Agency ("Audit Agency"). We affirm.

## FACTS AND PROCEEDINGS BELOW

### I. Procedural Background.

The state of Hawaii received federal funding pursuant to Title I of the Elementary and Secondary Education Act of 1965. In accordance with Title I, the federal government's Audit Agency conducted two audits. The Audit Agency issued Final Determination letters on December 2, 1977 and April 9, 1979, finding Hawaii had violated Title I provisions. Based on those findings, the Department of Education sought recovery from Hawaii of $2,109,618. Hawaii petitioned the EAB regarding both audits. The EAB heard the appeals simultaneously and affirmed both audits in separate opinions on September 21, 1982.

In October 1982, pursuant to 34 C.F.R. § 78.82 (1983), the parties submitted comments on the EAB's decisions to the Secretary of Education. On November 18, 1982 Hawaii also petitioned this court, pursuant to 20 U.S.C. § 1234d (1982), for review of the EAB's decision. On November 26, 1982 the Secretary of Education affirmed the decision of the EAB but remanded the case with instructions to reduce damages pursuant to the Title I statute of limitations. See 20 U.S.C. § 884 (1976). The Secretary affirmed the EAB in all other respects. The parties stipulated as to the reduction in damages. The EAB issued a final decision in February 1985.

### II. Background of the Elementary and Secondary Education Act of 1965.

Title I was enacted in an effort to assist financially state and local education

California, sitting by designation.

associations serving areas with a great number of children from low income families. The statute's goal was to expand and improve these children's educational programs in an effort to give them an education equal to that of children from more financially fortunate areas of the nation. 20 U.S.C. § 2701 (1982). The legislature perceived a national problem; many school children were not receiving an adequate public education. Title I was a "massive" effort to break the "link between economic privation and educational underachievement" in the nation. *New Jersey v. Hufstedler*, 662 F.2d 208, 210 (3d Cir.1981), *rev'd on other grounds sub nom. Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983).[1] "Title I funds were designed to supplement the basic education programs generally offered by state and local agencies.... Title I contemplated that state and local funds be allocated first, with Title I funds 'layered on top, thereby concentrating the available educational assistance on those needing it the most.'" *Indiana Dept. of Public Instruction v. Bell*, 728 F.2d 938, 941 (7th Cir.1984) (quoting *Alexander v. Califano*, 432 F.Supp. 1182, 1185 (N.D.Cal.1977)).

The statutory scheme of Title I is structured in a manner that ensures the funds appropriated to a state are used for the benefit of economically disadvantaged children. *Hufstedler*, 662 F.2d at 210. "Local education agencies obtain federal grants through state educational agencies, which in turn obtain grants from the Department of Education upon providing assurances to the Secretary that the local education agencies will spend the funds only on qualifying

programs." *Bell v. New Jersey*, 461 U.S. at 776, 103 S.Ct. at 2189 (citations and footnotes omitted); *Bennett v. Kentucky Department of Education*, — U.S. —, 105 S.Ct. 1544, 1547, 84 L.Ed.2d 590 (1985).[2] At the same time, the Act was not intended "to prescribe the specific types of programs or projects that will be required in school districts. Rather, such matters are left to the discretion and judgment of the local public educational agencies...." S.Rep. No. 146, 89th Cong., 1st Sess., *reprinted in* 1965 U.S.Code Cong. & Ad. News 1446, 1454. Two particular provisions of Title I work to ensure that the federal funds are spent by the state in the manner intended by Congress: the no-supplant and comparability provisions. It is the Secretary's interpretation of these statutes and the regulations enacted pursuant to that interpretation that Hawaii challenges on appeal.

## STANDARD OF REVIEW

Generally, an agency's interpretation of the statute which it administers, "while not binding, is entitled to substantial deference by a court." *Turner v. Prod*, 707 F.2d 1109, 1115 (9th Cir.1983) (citing *United States v. Rutherford*, 442 U.S. 544, 553–54, 99 S.Ct. 2470, 2475–76, 61 L.Ed.2d 68 (1979)), *rev'd on other grounds sub nom. Heckler v. Turner*, — U.S. —, 105 S.Ct. 1138, 84 L.Ed.2d 138 (1985). This court's review of a regulation's validity is limited to determining whether the regulation is reasonably related to the purposes of the enabling statute. *American Hospital Management Corp. v. Harris*, 638 F.2d 1208, 1212 (9th Cir.1981). The Secretary's

---

1. The Congressional Declaration of Policy states:

 In recognition of the special educational needs of children of low-income families and the impact that concentrations of low-income families have on the ability of local educational agencies to support adequate educational programs, the Congress hereby declares it to be the policy of the United States to provide financial assistance ... to local educational agencies serving areas with concentrations of children from low-income families to expand and improve their educational programs by various means ... which contribute particu-

larly to meeting the special educational needs of educationally deprived children
 20 U.S.C. § 2701 (1982).

2. The Hawaii school system is somewhat unique. There are no independent school districts. The Hawaii Department of Education operates a single state-wide system of public education through a number of administrative districts. Therefore, the Hawaii Department of Education is responsible for all the obligations that the Title I statute and regulations impose on state or local education agencies.

determination that a state has misused Title I funds must be supported by substantial evidence and must reflect an application of the proper legal standards. *Bennett*, 105 S.Ct. at 1550.

## MERITS

### I. The No-Supplant Provision.

In an effort to make clear that Title I funds were intended to supplement state funds in Title I schools, in 1970 Congress adopted 20 U.S.C. § 241e(a)(3)(B) (1976 Supp. V). This provision states:

> Federal funds ... will be so used (i) as to supplement and, to the extent practical, increase the level of funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs and projects assisted under this subchapter, and (ii) in no case, as to supplant such funds from non-Federal sources, ....

### A. The Secretary's Interpretation and Application of of the No-Supplant Provision.

The Secretary interprets the no-supplant provision to mean that a state must provide, with local funds, the same education for its Title I children as it does for its non-Title I children. In order to receive the funds, the project area [3] must assure the federal government that use of the grant funds will not result in a decrease in state and local funds to educate Title I students; and "neither the project area nor the educationally deprived children residing therein will otherwise be penalized in the application of State and local funds" because of the receipt of Title I funds. 45 C.F.R. § 116.17(h) (1972). The federal funds

> "(1) will be used to supplement, and to the extent practical increase, the level of

State and local funds that would, in the absence of such Federal funds, be made available for the education of pupils participating in that project; (2) will not be used to supplant State and local funds available for the education of such pupils; and (3) will not be used to provide instructional or auxiliary services in project area schools that are ordinarily provided with State and local funds to children in nonproject area schools."

*Id.*

In order to ensure proper state use of Title I funds, Congress authorized the Audit Agency to audit state expenditures. 20 U.S.C. § 1232f (1982). The Audit Agency audited Hawaii's expenditures with regard to the supplanting provision from 1973 through 1976. It determined that Hawaii had violated the no-supplant provision and misspent $398,495. In particular, the Agency found that Hawaii's Modified Curriculum Project and its Language Arts Project were improperly funded with Title I money.

Hawaii implemented a Modified Curriculum Project designed to keep in school those students who indicated, both through grades and attendance records, a likelihood of dropping out. The students who participated in the Modified Curriculum Project were enrolled in the Hawaii school system. Hawaii concedes, however, that the Project received no state funds and the children who participated attended no state-funded classes. Hawaii also implemented a Language Arts Project funded with Title I money. The students enrolled in the Language Arts Project did not attend any additional state-funded language arts classes. The Agency found these programs violated the no-supplant provision.

---

3. "'Project' means an activity, or a set of activities, proposed by a state or local educational agency or the Department of the Interior and designed to meet certain of the special educational needs of certain educationally deprived children.
 ... Project area means the attendance area, or combination of attendance areas, having a

high concentration of children from low-income families which, without regard to the location of the project itself, is designated as the area whose children are to be served by the project...."
45 C.F.R. § 116.1 (1972).

Hawaii asserts that the Secretary's interpretation of Title I's no-supplant provision is unreasonable. The state argues that availability of funds is what is crucial and the amount actually disbursed to each student is not material. It argues that even though the children in the Modified Curriculum Project attended no state-funded classes, they indirectly received state funding. This is because the state education budget allocations are made indirectly to all students by way of teacher assignments. Further, all Modified Curriculum Project students were given the opportunity to attend state-funded classes and therefore state funds were available. The state proffers the same arguments with respect to the Language Arts Project. The state also argues that because the courses offered to the Title I children in the Modified Curriculum Project and Language Arts Project were so different from that offered to the non-Title I children, those courses would not otherwise have been provided by the state.

Keeping in mind the substantial deference due an Agency's interpretation of a statute it administers, the Secretary's interpretation of the no supplant provision is reasonable. The Secretary emphasizes that the funds must directly benefit the individual children in a project area. *See* 45 C.F.R. § 116.17(h) (1972). The statute does not speak in terms of school districts. It speaks toward the educationally deprived children. 20 U.S.C. § 241e(a)(3)(B); *Bennett*, 105 S.Ct. at 1553. Hawaii misses the mark when it argues that because students in the Modified Curriculum and Language Arts Projects had the opportunity to attend state-funded classes, the state comported with the no-supplant provision. Title I requires that state and local funds actually be expended on Title I students rather than merely be available to those students. *Id.*

Hawaii has a self-imposed obligation to educate children under eighteen and in good standing in the state. Hawaii Rev. Stat. § 298–9 (West 1976 & Supp.1984). That education includes Language Arts. The Title I children participating in the

Projects at issue were entitled to a state education. Had there been no Title I funds for the Modified Curriculum and Language Arts projects, Hawaii would have expended state money on these projects. No state funds were spent on the Title I children participating in these projects. Perhaps this would be a closer question if Hawaii had simply decreased the amount of state funds spent on these Title I children. *See, e.g., Alexander v. Califano*, 432 F.Supp. 1182 (N.D.Cal.1977). This is not the case. Hawaii simply declined to spend any state funds for the Modified Curriculum and Language Arts Projects. "[T]he consequence was to increase per-pupil state and local expenditures for students who remained in regular [state-funded] classes. No plausible reading of the statute or regulations suggests that this result comports with the prohibitions on supplanting." *Bennett*, 105 S.Ct. at 1553. Hawaii must refund the Department of Education $398,-495 for the discovered violations. 20 U.S.C. § 1226a–1 (1982); *see also Bell v. New Jersey*, 461 U.S. at 790–91, 103 S.Ct. at 2197.

## II. The Comparability Requirement.

The comparability requirement found in Title I is a companion to the no-supplant provision. 20 U.S.C. § 241e(a)(3)(C) (1976). It too was enacted to ensure that federal Title I funds be used to aid educationally disadvantaged students. The section states: "[s]tate and local funds will be used ... to provide services in project areas which, taken as a whole, are at least comparable to services being provided in areas ... which are not receiving funds...." While the supplanting provision ensures that individual Title I students received funding, this section ensures that Title I students receive comparable services to those provided non-Title I children through state expenditures. The state, as a condition to receiving federal funds, must ensure that project area schools are comparable to all other state schools in the district. *Id.;* 16 Cong.Rec.H. 10614 (April 7, 1970) (statement of Con-

gressman Quie) ("The whole purpose of Title I is to concentrate and increase efforts on behalf of disadvantaged children.... Unless comparable services are provided before the application of Title I funds in the schools serving concentrations of poor children this purpose is defeated.")

### A. The Secretary's Interpretation and Application of the Comparability Requirement

In order to implement the comparability requirements, the Secretary promulgated 45 C.F.R. § 116.26 (1973).[4] The regulations require that Hawaii show

(1) The number of children enrolled per instructional staff member, ... for each public school serving a Title I project area is not more than 105% of the average number of children per instructional staff member in all [non-Title I schools];

(2) The annual expenditure per child, ... in each public school serving a Title I project area is not less than 95% of such expenditure per child in all [non-Title I schools].

45 C.F.R. § 116.26(c)

The regulation also directs that each local education agency submit reports with specific information showing compliance with the comparability requirement. 45 C.F.R. § 116.26(b) (1973). Hawaii challenges the Secretary's interpretation and application of the comparability provision.

Hawaii argues that the Secretary's reliance on a fixed five percent variance rate is an inappropriate measure of comparability. It believes that the Secretary should adopt a more flexible approach for determining comparability and urges this court to find the regulation invalid. It relies primarily on *Maryland v. Mathews*, 415 F.Supp. 1206 (D.D.C.1976).

The court in *Mathews* found that the agency in charge of distributing federal grant-in-aid funds pursuant to the Aid to

Families With Dependent Children program acted unreasonably and arbitrarily in enacting certain regulations. Specifically, a state was required, before receiving federal matching funds, to show that no more than five percent of all payments were overpayments and no more than three percent were paid to ineligibles. *Id.* at 1208–09. The court found these fixed percentages to be arbitrary, unreasonable, and unrelated to the purposes for which the statute was enacted. *Id.* at 1214. The court first noted that a study showed the level set to be unreasonably low. *Id.* at 1213. At best only nine states were in compliance in the two-year period at issue. *Id.* Further, the agency was unresponsive to concerns voiced by a number of states. The court found that the result of the agency's regulation was to "unreasonably [make] funds unavailable to fulfill the purpose of the Act...." *Id.* at 1214.

Hawaii, with absolutely no explanation, "submits that the circumstances relied on to strike down the error rates in *Mathews* exist here." We disagree. Indeed, the record shows that the great majority of those schools audited in Hawaii were found to comply with the five percent variance rate set forth in the Secretary's regulations. Further, Hawaii has presented absolutely no evidence to show that the Department of Education has been unresponsive to concerns voiced by Hawaii or other states. To the contrary, the record shows that the Department of Education spends a considerable amount of time answering questions and issuing advisory letters.

The other cases relied upon by Hawaii to show that a fixed variance rate is not favored are inapposite. They address racial segregation in schools and necessarily involve considerations different from those present here. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Price v. Denison Independent School District*,

---

**4.** The Secretary derives his authority to implement regulations from 20 U.S.C. § 242(b) (1982). That section states: "The Secretary shall administer this chapter, and he may make such regulations and perform such other functions as he finds necessary to carry out the provisions of this chapter." 20 U.S.C. § 242(b).

694 F.2d 334, 353–68 (5th Cir.1982); *Brown v. Board of Education of the City of Chicago,* 386 F.Supp. 110, 122–25 (N.D.Ill. 1974); *Carr v. Montgomery County Board of Education,* 377 F.Supp. 1123 (M.D.Ala.1974), *affirmed,* 511 F.2d 1374 (5th Cir.), *cert. denied,* 423 U.S. 986, 96 S.Ct. 394, 46 L.Ed.2d 303 (1975).

■ The Secretary has broad authority to promulgate regulations for implementing Title I. 20 U.S.C. § 242(b) (1982). The decision to employ a five percent variance rate to measure comparability bears a rational relationship to the purposes of the statute. The statute requires comparability before granting federal funds. It is concerned that the state provide Title I children with basic services equivalent to those received by children in non-Title I schools. Sen.R. No. 91–634, *reprinted in* U.S.Code Cong. & Admin.News p. 2768 (1970). The Secretary determined that the best way to ensure nearly equal services was to employ a five percent variance test to measure comparability. This is a reasonable determination. Further, Congress had numerous opportunities to disapprove the Secretary's interpretation and implementation of the comparability statute. It has not done so. This is some evidence of the reasonableness and propriety of the five percent variance test. *See Lorillard v. Pons,* 434 U.S. 575, 580–81, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative ... interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change...."). While this court might agree with Hawaii that a more flexible measure of determining comparability is desirable, such agreement does not constitute grounds for invalidating the Secretary's regulation. *See Batterton v. Francis,* 432 U.S. 416, 425, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977) (a court may not set aside a regulation simply on the grounds that it would have interpreted the statute differently).

Hawaii also challenges specific findings of non-comparability made by the EAB and adopted by the Secretary. Hawaii asserts that in four separate instances, the Board's decision either was not supported by substantial evidence or resulted from misinterpreting the comparability statute.

### 1. Hawaii's Three-on-Two Program

In 1969 Hawaii implemented a "three-on-two" program in some of its elementary schools wherein it assigned three teachers to two classes. A school's participation in the program was voluntary. It ended in the 1976–77 school year. The record does not indicate how many Title I schools participated in the program.

In its initial study to determine comparability before expending federal Title I funds, the state included the three-on-two programs. The Agency likewise included the programs in its comparability calculations. Hawaii argues that these programs should have been excluded by the Agency. First, it relies on 45 C.F.R. § 116.26(b)(2) (1973) which directs that only "regularly assigned" teachers are to be included in comparability calculations. It asserts that the third teachers in the three-on-two program were not regularly assigned. Second, Hawaii argues these programs were experimental and therefore should have been excluded by the Agency. To support this argument, it looks to 20 U.S.C. § 2751 (1982), a 1978 amendment to Title I which excludes experimental projects from comparability determinations.

■ The Audit Agency's inclusion of the three-on-two program was reasonable and supported by substantial evidence. "Regularly assigned" has a plain meaning. The record in this case shows that the third teachers in the three-on-two program were assigned to the same school every year for seven years, were full-time staff members, and were co-equal to the other two teachers working with the same number of students. These third teachers were therefore regularly assigned to the schools participating in the three-on-two program.

The three-on-two program was not clearly experimental. It was officially labeled experimental for only the first three years

and existed five years thereafter. Further, Hawaii has not shown that the 1978 amendment excluding experimental programs should be applied retroactively. Even assuming retroactive application, the program would still be properly included in comparability calculations. Section 2751(d) sets forth eleven requirements which must be met before a program can be considered experimental. Hawaii has not shown that it meets these requirements. Indeed, the record in this case indicates Hawaii's program would fall far short of qualifying for exclusion.[5] The EAB's and the Secretary's approval of the Audit Agency's decision to include the three-on-two program in its comparability calculation is reasonable and supported by substantial evidence.

## 2. Instructional Staff Members

Hawaii also boldly asserts, with no supporting argument, that the Audit Agency should not have denied instructional staff status to certain clerical, security, and museum personnel. We disagree.

In calculating comparability the Audit Agency, pursuant to 45 C.F.R. § 116.26 (1973), includes all instructional staff members. 45 C.F.R. § 116.26(b)(7) states:

The term "instructional staff members" as used in this section means staff members who render direct and personal services which are in the nature of teaching or the improvement of the teaching-learning situation. The term includes teachers, principals, consultants, or supervisors of instruction, librarians, and guidance and psychological personnel; it also includes aides or other paraprofes-sional personnel employed to assist such instructional staff members in providing such services.

 In Hawaii's initial study to determine comparability before expending federal Title I funds, the state included as instructional staff members bookkeepers, playground security and school crossing guards, and a museum curator and her aide. The Audit Agency, in its calculations, excluded these staff members. The Secretary approved this exclusion. We agree with the Secretary that bookkeepers and guards for playground security and school crossings do not perform work "in the nature of teaching or the improvement of the teaching-learning situation."

 We also agree that the museum curator and her aide should have been excluded. These staff members worked in a museum located at an elementary school which, although it served the school's students, also served other schools and the general public. We agree with the Secretary that it would not be proper to attribute all of the services provided by the museum to the school at which it was located. There is no evidence in the record to show what fraction of the state funds spent on the museum should be attributed to the elementary school.[6]

## 3. Longevity Exclusions

Hawaii next asserts, again without supporting argument, that calculations of teachers' salaries should have excluded so-called horizontal longevity. When making

---

5. For example, Hawaii makes no effort to show that "the purpose of the program is to provide for the comprehensive and systematic restructuring of the total educational environment at the level of the individual school." 20 U.S.C. § 2751(d)(2) (1982). Nor does Hawaii show that "parents and school staff are involved in comprehensive planning, implementation, and evaluation of the program." *Id.* at 2751(d)(4). The state does not show that "schools participating in a program describe, in a school level plan, program strategies for meeting the special educational needs of educationally deprived children." *Id.* at 2751(d)(6).

6. 20 U.S.C. § 1234a(b) (1982) states that a final determination letter by the Audit Agency must contain sufficient detail to identify with particularity those expenditures which are not allowable. "Unless the Board determines that a final audit determination lacks sufficient detail, the burden shall be upon the State or local educational agency to demonstrate the allowability of expenditures disallowed in the final audit determination." The EAB's determination that the Audit Agency was correct in excluding the museum curator and her aide from instructional staff status is supported by substantial evidence. Hawaii did not meet its burden of refuting this exclusion.

its initial comparability calculations in order to expend federal Title I funds, Hawaii determined its instructional staff salaries. Pursuant to 45 C.F.R. § 116.26(b)(4) (1973), the state excluded from its calculations salary differences attributable to longevity. Hawaii teachers' salary schedules are based on a matrix of class ranges and steps. Steps represent longevity increments within a given class range. Class ranges represent the credentials a teacher has accumulated. Longevity payments excluded by Hawaii in its initial calculations corresponded to the difference between the salary a teacher actually earned at his or her actual rank and step level and the salary that teacher would have earned at step 1 of his or her rank. Hawaii has labeled the steps, or years of experience, as vertical longevity. It has labeled a teacher's credentials, or class range, as horizontal longevity. Horizontal longevity is a creation of state legislation. Haw.Rev. Stat. § 297–33(g) (1976) provides:

A teacher is required to spend at least one year in class III before going on to class IV, at least one year in class IV before going on to class V and at least one year in class V before going on to class VI.

Hawaii did not exclude horizontal longevity from its salary calculations. Before the EAB, Hawaii claimed that when it excluded only vertical longevity, its calculations were an inaccurate reflection of the longevity component. The EAB rejected the state's argument on two grounds. First, it found that by the Agency's adoption of the state's calculations, the Agency implicitly found those calculations to be reasonable. The EAB noted that "Hawaii is intimately familiar with its own laws and teacher seniority system. The state chose to calculate comparability by eliminating differences in steps but not in classification. These factors support our conclusion that the original figures used by the auditors are proper ones." Second, the EAB found

that the longevity exclusion was, with regard to salary increments, based on length of service. "However these Hawaii statutory requirements should be characterized, they are not salary increments, but rather a bar to immediate salary increments.... The panel does not find that Congress intended comparability to be calculated by adding to the base salaries of teachers and staff theoretical amounts that the teachers or staff would have made except for Haw. Rev.Stat. § 297–33(g)." The panel concluded that the provision that Hawaii relied upon did not address longevity at all and therefore upheld the Audit Agency's findings of non-comparability. The Secretary approved the findings of the EAB.

■ We cannot say that the Secretary's decision is unsupported by substantial evidence. Longevity was excluded from the calculations as required by the regulations. We agree with the Secretary that Hawaii's calculations were reasonable. Nowhere in the record does Hawaii show that by recalculating staff salaries and excluding horizontal longevity would there be a discernibly different result.

### 4. Title I Preschools

■ Hawaii argues that its preschool program should have been excluded from comparability calculations. Hawaii believes that because preschools do not exist in non-Title I schools there is nothing with which to compare the Title I preschool program. We agree with the Secretary that it is of no consequence that state funds are not spent on preschools in non-Title I schools. If a school is found to be non-comparable, it must repay all misused Title I funds. Hawaii has conceded that the Title I preschools are "administratively attached" to the schools that were found to be non-comparable. The Audit Agency properly included all Title I funds expended by the non-comparable schools when the refund was demanded.[7]

---

7. Hawaii also asserts that the EAB improperly excluded evidence. Hawaii raises this argument for the first time in its reply brief. This is an untimely introduction, and so we will not

address the argument. *Berkovitz v. Islamic Republic of Iran,* 735 F.2d 329, 331 (9th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 510, 83 L.Ed.2d

### III. Repayment of Misused Title I Funds.

██ Hawaii argues that it has no obligation to repay the funds used in violation of the comparability requirement. It asserts that comparability is a qualitative, rather than quantitative requirement and that substantial compliance is sufficient.[8] Hawaii relies on 20 U.S.C. §§ 1234b(a), 1234c, and 2836 (1982) which authorize the Secretary to withhold funds or issue cease and desist orders when a recipient fails to comply substantially with the law. It believes that because it substantially and in good faith complied with Title I's comparability provision, it should not be liable for the amount misspent. *Bell v. New Jersey*, 461 U.S. at 794, 101 S.Ct. at 2199 (J. White, concurring) ("[T]here is a significant issue whether a state can be required to repay if it has committed no more than a technical violation of the agreement. . . .); *see also Kentucky Department of Education v. Secretary of Education*, 717 F.2d 943, 948 (6th Cir.1983) (substantial, good faith compliance with the no-supplant provision), *rev'd sub nom. Bennett v. Kentucky Department of Education*, — U.S. —, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985). Hawaii claims its violations were only technical.

██ Hawaii is mistaken in believing that good faith substantial compliance with the comparability provision is sufficient to avoid repayment of misused funds. First, the reference to substantial compliance in those sections relied upon by Hawaii "do not by their own terms apply to the recovery of misused funds." *Bennett*, 105 S.Ct. at 1549. If Congress intended substantial compliance to apply to the comparability

provision it could have explicitly so stated. *Id.* ("[W]e . . . disagree with the suggestion . . . that substantial compliance with applicable legal requirements affects liability.").

██ Further, an absence of bad faith does not excuse a state from liability if funds were in fact spent contrary to the terms of the grant agreement. *Id.* at 1550. Funds are misused when the state does not fulfill its assurances that it will abide by the conditions of Title I. *Bell v. New Jersey*, 461 U.S. at 790–91, 103 S.Ct. at 2197. Misuse does not depend on any subjective intent of the recipient state. *Bennett*, 105 S.Ct. at 1550. "There is no indication that grantees may avoid repayment by showing that improper expenditures were made in good faith." *Id.* (footnote omitted).

██ Finally, this violation is not technical. The comparability provision is a substantive requirement—a condition precedent to receipt of federal funds. Noncomparability is a substantive violation. *See Bennett*, 105 S.Ct. at 1554, n. 5 (finding a violation of the companion no-supplant provision is a substantive, rather than technical, violation).

Hawaii also argues that a refund of all Title I monies spent by noncomparable Title I schools is inappropriate. It contends this kind of refund does not bear any relationship to the degree to which Hawaii may not have been in compliance with the comparability requirement. Further, Hawaii believes that a total refund constitutes a sanction or penalty and engenders a result contrary to the purposes of Title I. We disagree.

██ Comparability is a condition a school must meet prior to receipt of federal

---

401 (1984); *Preservation Coalition, Inc. v. Pierce*, 667 F.2d 851, 862 (9th Cir.1982).

**8.** The Secretary argues that this court may not consider this argument. He asserts that because Hawaii did not raise this issue in the agency proceedings, it may not be raised now. He relies on *Pierce County v. United States*, 699 F.2d 1001, 1005 (9th Cir.1983). We disagree. Hawaii relies on *Kentucky Department of Education v. Secretary of Education*, 717 F.2d 943, 948 (6th Cir.1983), *rev'd sub nom. Bennett v. Kentucky Department of Education*, — U.S.

—, 105 S.Ct. 1544, 84 L.Ed.2d 590 (1985) in positing this argument. That case was not decided until after the agency proceedings involved in this case. It would be unfair to preclude Hawaii from relying on case law favorable to its position in an appeal before this court. *United States v. Whitten*, 706 F.2d 1000, 1012 (9th Cir.1983). Further, we find that the record supports an implicit argument by Hawaii before the EAB that Hawaii complied substantially with what it believed to be a reasonable interpretation of the statute.

Title I funds. "The State gave certain assurances as a condition for receiving the federal funds, and if those assurances were not complied with, the Federal Government is entitled to recover amounts spent contrary to the terms of the grant agreement." *Id.* at 1549 (citing *Bell v. New Jersey*, 103 S.Ct. at 2197). Any Title I funds expended on any Title I school that fails to provide comparable levels of service are misspent funds. Hawaii misspent Title I funds in violation of the comparability requirement; it did not provide an adequate level of state funding to meet the basic services in these Title I schools. Such non-comparability invariably adversely affects all services offered by the Title I school. Consequently, any Title I funds spent at a non-comparable school are misspent funds. Further, requiring a refund of all funds expended in schools found to be violating Title I provisions is not a sanction. "Although recovery of misused Title I funds clearly is intended to promote compliance with the requirements of the grant program, a demand for repayment is more in the nature of an effort to collect upon a debt than a penal sanction." *Bennett*, 105 S.Ct. at 1549 (*citing Bell*, 461 U.S. at 782, 103 S.Ct. at 2193). The state gave assurances that its Title I expenditures would comply with statutory requirements. It did not fulfill these assurances. All Title I funds spent in schools found to be noncomparable must be refunded.[9]

## CONCLUSION

The Secretary's interpretation and application of the no-supplant provision is reasonable. His conclusion that Hawaii violated that provision is supported by substantial evidence. The Secretary likewise reasonably interpreted and applied the comparability requirement. His decisions to include Hawaii's three-on-two programs, to deny instructional staff status to certain clerical, security, and museum personnel, to exclude so-called horizontal longevity from teacher salaries, and to include preschool calculations in calculating comparability are all supported by substantial evidence. Finally, contrary to Hawaii's assertions, it is obligated to repay all funds used in violation of the comparability requirement.

The decision of the Secretary is AFFIRMED.

---

**9.** We note that upon a finding by the Secretary that a school has come into compliance with Title I, that school need only repay 25% of the amount which was found by the Secretary to have been misspent:

> Whenever the Secretary has recovered funds allowing a final audit determination with respect to any applicable program, he may consider those funds to be additional funds available for that program and may arrange to repay to the State or the local agency affected by that action not to exceed 75% of those funds upon his determination that—
> (1) The practices or procedures of the State of local agency that resulted in the audit determination have been corrected, and that the

State or the local agency is in all other respects in compliance with the requirements of that program;
> (2) The State or the local agency has submitted to the Secretary a plan for the use of those funds pursuant to the requirements of that program and, to the extent possible, for the benefit of the population that was affected by the failure to comply or by the misexpenditures that resulted in the audit exception; and
> (3) The use of those funds in accordance with that plan would serve to achieve the purposes of the program under which the funds were originally granted.

20 U.S.C. § 1234e.