Filed 4/11/25  Camp v. Los Angeles Unified School District CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| JASON CAMP,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>Defendant and Appellant. | B318925, B321227<br><br>(Los Angeles County Super. Ct. No. BC673403)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed on March 25, 2025, is modified to reflect the following revision on page 10: "Delnavaz testified" is inserted between "from his desk," and "he acknowledged."

Plaintiff's petition for rehearing is denied.  There is no change in judgment.

_____

BAKER, J.             HOFFSTADT, P. J.             MOOR, J.

Filed 3/25/25  Camp v. Los Angeles Unified School District CA2/5 (unmodified opinion)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| JASON CAMP,<br><br>　　Plaintiff and Appellant,<br><br>　　v.<br><br>LOS ANGELES UNIFIED SCHOOL DISTRICT,<br><br>　　Defendant and Appellant. | B318925, B321227<br><br>(Los Angeles County Super. Ct. No. BC673403) |

　　APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge.  Affirmed in part, reversed in part, and remanded with directions.

　　Gusdorff Law and Janet Gusdorff; Law Offices of Renuka V. Jain and Renuka V. Jain for Plaintiff and Appellant.

　　Los Angeles Unified School District Office of General Counsel and Nazli Alimi; Hurrell Cantrall and Melinda Cantrall for Defendant and Appellant.

Plaintiff Jason Camp (plaintiff) was employed by defendant Los Angeles Unified School District (defendant or LAUSD) as a principal at a continuation high school. In this action for whistleblower retaliation (Lab. Code,[1] § 1102.5, subd. (b)) and violation of the Fair Employment and Housing Act (FEHA), plaintiff contends he was fired for questioning certain funding decisions and for objecting to discriminatory comments made by a superior. A jury found for plaintiff on the whistleblower claim and for defendant on the FEHA claim. LAUSD appeals, asking us to decide whether there is substantial evidence that plaintiff had reasonable cause to believe his challenges to funding decisions disclosed a violation of law. Plaintiff also appeals, and he asks us to decide whether defense counsel's references at trial to a closed investigation into sexual misconduct warranted a new trial on the FEHA claim or at least monetary sanctions.

## I. BACKGROUND[2]

### A.    *The Operative Complaint*

Plaintiff commenced this action in August 2017. His operative fourth amended complaint, filed in November 2018, includes causes of action for unlawful retaliation in violation of section 1102.5 and violation of FEHA (Gov. Code, § 12940, subd.

---

[1]    Undesignated statutory references that follow are to the Labor Code.

[2]    Defendant's request for judicial notice of documents relating to school funding and the legislative history of section 1102.5 is denied. The documents, even if judicially noticed, would not alter our disposition of the appeal.

(h)).[3]  Plaintiff alleges he was fired from his position as principal at Owensmouth Continuation High School (Owensmouth) based on a pretextual finding that he falsified students' grades to make them eligible to play football at an affiliated school, Canoga Park High School (Canoga Park).

With respect to the section 1102.5 whistleblower retaliation cause of action, plaintiff alleges he was fired, among other reasons, for complaining to his superiors about defendant's alleged misuse of federal funds received under Title I of the Elementary and Secondary Education Act, as amended by the Every Student Succeeds Act (20 U.S.C. § 6301, et seq.).[4]  With respect to the FEHA cause of action, plaintiff alleges he was fired in retaliation for complaining about national origin discrimination against a colleague.

The case first went to trial in early 2020, but the trial court declared a mistrial due to the COVID-19 pandemic.  In 2021, the trial court held a court trial on the timeliness of the FEHA cause of action and concluded the statute of limitations was equitably tolled and defendant was equitably estopped from asserting a statute of limitations defense.  A jury trial on plaintiff's whistleblower retaliation and FEHA causes of action ensued.

---

[3]  The trial court sustained a demurrer to additional causes of action.

[4]  Hereinafter, we refer to the federal statutory scheme as Title I for short.

*B.    The Evidence at Trial*

*1.    Plaintiff's career through 2016*

Plaintiff began working for LAUSD beginning in or about 1996.  In addition to teaching, plaintiff coached football for roughly 16 years.  In 2012, plaintiff became principal at Independence Continuation High School.

In subsequent years, plaintiff declined multiple suggestions by his local superintendent, Dr. Vivian Ekchian, that he accept a lateral transfer.  Plaintiff believed he should be promoted instead.  Plaintiff relented in 2016, however, and accepted a lateral transfer to serve as principal at Owensmouth.  Plaintiff was expected to help develop a pilot program with nearby Canoga Park in which students could "seamless[ly]" transition between Owensmouth and Canoga Park "so there wouldn't be that stigma of a continuation high school."

Plaintiff held leadership positions in various professional organizations.  He was president of the Senior High School Options Principals Organization (the principals organization), which represented principals at continuation high schools within LAUSD.[5]  According to plaintiff, the principals organization "is not a union," but serves "to create a two-way communication

---

[5]    Plaintiff testified that continuation schools are one form of an options school.  His colleague, Dr. Alex Placencio, testified that "[o]ption[s] schools are schools that are designed for students to come and make up credits.  They are sent to us for various reasons, but the one thing they all have in common is that they are behind, severely behind, in credits.  So we have an abbreviated program at our option[s] schools to help those students move forward to graduate or . . . return back to the school that they came from."

between [defendant] and the people in [the] organization."
Plaintiff also served as vice president of the executive board of his
union, the Associated Administrators of Los Angeles (the union).

>    2.    *Plaintiff's advocacy on behalf of students and*
>          *colleagues*

Plaintiff advocated for students and colleagues in an
individual capacity and in connection with his positions in the
principals organization and the union.  In 2014, plaintiff
challenged plans to cancel a "twilight" program serving students
outside traditional school hours and to transition 18-year-old
students into adult school programs.  Plaintiff relies on this
advocacy as context for his FEHA and whistleblower retaliation
causes of action.[6]

In 2014, plaintiff attended a meeting of options school
principals where an administrator responded to a Latina
principal's request to clarify an email by asking whether she
could read English.  Plaintiff drafted a letter of complaint to the
union in response.  Plaintiff also subsequently complained about
an administrator, Dr. Earl Perkins, who was present at the 2014
meeting but remained silent (and who allegedly made racially
discriminatory comments in other settings).  After Dr. Perkins
was re-assigned and no longer supervised options schools,

---

[6]    As we later discuss, the special verdict form submitted to
the trial jury asked only whether plaintiff complained about
discriminatory comments and whether he reasonably believed he
disclosed a violation of Title I.  Plaintiff does not contend the
proposals to cancel the twilight program or shift 18-year-old
students to adult schools violated Title I.

plaintiff and colleagues lobbied senior administrators to make sure he never returned to his earlier role.

In 2015 and 2016, plaintiff raised concerns about how defendant allocated Title I funds it received. His concerns focused on defendant's use of a "norming day" early in the school year to assess schools' student population and financial need. According to plaintiff, "[t]he problem is that norming is done in October. [Defendant] take[s] a look at the students and then they take a look at the socioeconomic levels of the students and then compensatory [Title I] funds are distributed [in] that manner. [¶] The problem was, at the beginning of the year when that happened, we only had 80 or 90 students . . . . It was after that date that the [comprehensive, or non-continuation] high schools then, after receiving the funds and capturing the numbers for their own school, began to shift these students towards continuation schools."

When asked whether there is a Title I regulation "requir[ing] funds to follow a student," plaintiff explained he "do[es] not know if there's a Title I regulation that requires that. But [he] believe[s] that is the actual pinpoint of the concern. If there isn't one, we need to address it. The money is not following the students. And by the time they get to [plaintiff], [he] do[es not] have the money to provide the services that they need. That i[s] the essence [of] the problem." Plaintiff's friend and fellow options principal, Dr. Alex Placencio, testified LAUSD has "tremendous discretion" as to how it distributes Title I funds among schools and he has not "suggested that the funds were being illegally used."[7] Defendant's chief academic officer, Dr.

---

[7]    Dr. Placencio later testified his concern with respect to defendant's handling of Title I funds "was at a minimum that it

6

Francis Gipson, met and corresponded with plaintiff and other options principals regarding funding issues in 2016.

Plaintiff believes inadequate funding to continuation schools and an "over-focus on 100 percent graduation" led defendant to emphasize online credit recovery programs, which allowed students to be "on computers at home by themselves without teachers passing course work, not knowing who was doing it, and suddenly passing classes within a week."[8]  Plaintiff testified that, after the union asked defendant for detailed information regarding funding, his union representative told plaintiff and a colleague to "stop complaining so much" and to "stop telling [plaintiff's] superintendent no."  Plaintiff understood the latter comment to mean that he should accept the lateral transfer to Owensmouth.

Dr. Carol Alexander is an LAUSD employee involved in creating budgets.  She testified, among other things, that "Title I funds are set based on a norm day" (the fifth Friday of the school year) and she does not "know of a district that has the Title I funds moved midyear" if students change schools.  She "[could not] even think of a way that you would manage it with a student movement within the school year because you have to write a plan, and you provide a plan of action of how you're going to serve those kids based on that.  [¶]  And if that funding is constantly

---

was, you know, gross management of funds, allocation of funds, and at the very worst, illegal what they were doing."  He acknowledged he "broadened" his previous testimony that he was not concerned that Title I funds were being used illegally.

[8]     Credit recovery programs enable students to make up credit or improve grades in classes they have already taken.

changing midyear, it would be very hard to follow through on that plan. . . ."

Plaintiff's education policy expert, Dr. Nathaniel Malkus, testified concerning flaws in credit recovery programs, including the purported over-use of credit recovery, the need for "more direct teacher support" in these programs, and the obstacles to providing such support through online learning. Dr. Malkus testified that "in the areas or in the kinds of school that have this really high volume of credit recovery, and those tend to be the ones that are doing more of it online, those students are disproportionately less advantaged."

### 3. *Investigation concerning grade falsification and plaintiff's subsequent dismissal*

A great deal of testimony at trial concerned defendant's proffered reason for dismissing plaintiff and whether it was pretextual. For our purposes, we need only briefly summarize.

Near the beginning of the 2016-2017 school year, soon after plaintiff became principal at Owensmouth, the California Interscholastic Federation (CIF) contacted defendant concerning certain Canoga Park students' grades and their eligibility to play football. Dr. Ekchian (the local superintendent) asked Nader Delnavaz (Delnavaz), a "director" charged with supervising Owensmouth, to investigate the matter.

During the investigation, it emerged that two students received A grades for a 12-day summer class at Owensmouth that made them eligible to play football for Canoga Park. Plaintiff had signed "complimentary report" forms indicating the students were doing "outstanding" work in a "weightlifting program" called "PE 2B" that took place from July 28, 2016, through

8

August 12, 2016.  A counselor, Nuria Steinhauer, stated she entered official grades for the students based on the complimentary reports.

The complimentary report forms are dated August 12, 2016, and handwritten notes indicate "AEE" was to be the "final grade."  No summer classes were in session between July 28, 2016, and August 12, 2016, however, and the Owensmouth campus was closed to students at that time.

Plaintiff maintained he never intended the students to receive a grade for work completed in August 2016.  According to plaintiff, he was introduced to the students at issue by Ivan Moreno (Moreno), Canoga Park's football coach and dean of students.  Plaintiff testified the complimentary reports were not grade slips, and he "used the[m] to note . . . that [he] was accepting work in progress."  Plaintiff "wr[o]te down 'AEE final grade'" based on "what [Moreno] told [him] [the students] received during this period," but plaintiff "had no idea . . . that none of these kids were supposed to be on his campus. . . ."  Plaintiff understood the students were to receive grades for a period of instruction ending in September.  In the process of entering grades for Advanced PE 2B, the students were inadvertently enrolled in another class called Advanced PE 2A.

Plaintiff testified that, around the middle of September, Moreno approached him "to gauge . . . whether or not [they] could . . . make these grades a summer school grade."  Plaintiff told Moreno "no, it was a fall class."  Plaintiff reiterated his position when an assistant coach sent him a text message indicating "[CIF] need[ed] the transcript to have an end date before school started on 8/10 or something so it reads as a summer class."  Plaintiff believes someone altered official records

9

to reflect the students completed Advanced PE 2B in August rather than September—i.e., that the complimentary reports were used to enter grades without his approval.

Plaintiff acknowledged he did not disclose the text message he received from the assistant coach when he had his initial conversation with Delnavaz, the Owensmouth supervisor investigating the CIF allegations. Although plaintiff suggested Moreno must have taken the complimentary reports from his desk, he acknowledged "ma[king] a mistake of some sort," and offered to "fix" the grades. Plaintiff informed Delvanaz in writing that complimentary reports were not intended to reflect final grades, that he refused Moreno and the assistant coach's requests to back-date the grades (including via text message), and that he "[did] not know who at Canoga Park HS accessed the . . . student information system and changed the . . . date of completion for the two students in question from September 7, 2016[,] to August 12, 2016."

Defendant issued plaintiff a notice of unsatisfactory acts in December 2016 that accused him of falsifying final grades for the two students for credit recovery work completed between July 28, 2016, and August 12, 2016.

Dr. Ekchian convened a *Skelly* hearing for plaintiff in January 2017.[9] Dr. Ekchian believed plaintiff had made "big mistakes" and she "wanted to understand during the *Skelly* what had created this judgment flaw . . . so that [she] could weigh that

---

[9] "Skelly hearing" refers to the administrative hearing required by *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194 (*Skelly*), a case that holds a permanent civil service employee has due process rights in continued employment.

10

in [her] decision to continue his employment or to proceed with a dismissal process." At the hearing, plaintiff presented declarations from two students. One declaration stated plaintiff resisted Moreno's efforts to falsify records, and both stated Moreno promised to fix their grades. Plaintiff also presented the text message exchange in which he refused the assistant coach's request to back-date grades.

Dr. Ekchian testified the student declarations did not warrant further investigation because she knew plaintiff had signed the complimentary reports. She believed "the timeline of these things that had occurred w[as] after the compl[i]mentary report was created by [plaintiff] and entered at Canoga Park . . . . So all these things were really after the fact."

Dr. Ekchian concluded a dismissal recommendation should be forwarded to the Board of Education. The Board of Education voted to dismiss plaintiff in April 2017.

Plaintiff appealed his dismissal to the Office of Administrative Hearings (OAH), which determined defendant failed to establish by a preponderance of the evidence any of the charges supporting plaintiff's dismissal. Defendant offered to reinstate plaintiff, but he declined because the offer was not to return to his previous position and he was already employed elsewhere.[10]

---

[10] After initially instructing the jury only as to OAH's ultimate conclusion, the trial court granted plaintiff's motion (over defendant's objection) to instruct the jury as to several specific OAH findings.

### 4. *Evidence of damages*

Plaintiff's wife, Morena Camp, testified plaintiff was "[n]ot the man [she] married" during and after the disciplinary process. Dr. Placencio knew plaintiff was drinking a lot, stopped caring about his appearance, and lost weight. Psychiatrist Dr. Donald Eknoyan and therapist Marilyn Stern-Granby testified concerning their treatment of plaintiff in 2017 and 2018 and his diagnoses of adjustment disorder and depression.

Plaintiff's expert, psychiatrist Anthony Reading, diagnosed him as suffering from an adjustment disorder with anxiety and major depressive disorder with anxious distress. Defendant's expert, psychiatrist Manuel Saint Martin, opined plaintiff exaggerated his symptoms and did not meet the criteria for major depressive disorder.

### 5. *Sexual abuse allegations and plaintiff's mistrial motion*

On direct examination by plaintiff's attorney, Dr. Placencio was asked about his role in helping plaintiff respond to the grade falsification charges. Dr. Placencio emphasized plaintiff "had never had to do anything like that before in his career. He's never been in trouble before . . . ." On cross examination, one of defendant's attorneys asked Dr. Placencio whether plaintiff had "ever share[d] . . . that months before the false grade investigation, that he had been contacted by LAPD regarding another investigation[.]" Dr. Placencio testified plaintiff told him "[a] young lady had written a note that he was inappropriate with her" and others at the school "were somehow in cahoots with [plaintiff] and this kind of behavior." Dr. Placencio was present when plaintiff met with a police officer who told him "there [was]

no merit to the accusations" and apologized for his having "to go through this."

Plaintiff's attorney did not object to this line of questioning until defense counsel asked Dr. Placencio whether the individuals "who made the decision regarding [plaintiff's] false grades also kn[e]w about the investigation involving LAPD . . . ." When defense counsel later asked Dr. Placencio whether he had personally investigated the matter, the trial court sustained plaintiff's objection on Evidence Code section 352 grounds.

Later, outside the presence of the jury, plaintiff's attorney told the trial court she had "never heard anything about this police investigation" and had "never seen any documents referring to it." She did not object during Dr. Placencio's testimony because "then it's [a] red flag all over the place so [she] wanted it all to come in," but "if there [was] some documentation, [she] want[ed] to see it." The trial court asked defense counsel whether there were any relevant documents. Counsel explained "it was an allegation of rape," there was "what's called an ISTAR," and "[t]here was an investigation, including an e-mail to [Dr. Ekchian] which made it highly relevant to the decisionmaker, and the accusation against her is that she was retaliating when there was this other investigation going on." The trial court stated it "expect[ed] counsel to turn over to plaintiff whatever documentation [it] ha[d] on that issue . . . ."

The next day, again outside the presence of the jury, defense counsel told the trial court that plaintiff's attorney refused to accept a copy of a report with a name redacted. Defense counsel stated her "understanding, from speaking to law enforcement, is that it's an active investigation and that it would be appropriate to redact just the student's name. And other than

13

that, [she was] happy to send it over . . . ." The trial court ordered defendant to produce the redacted copy of the report.

The following Monday, the trial court stated it had received the ISTAR report and asked whether plaintiff wanted to be heard further. Plaintiff's counsel argued the court previously "ordered defense counsel to produce the entirety of the report, not just the ISTAR," and she "underst[oo]d from some investigation that there is a lot of material that was handed over to LAUSD related to this" that had not been produced.

The defense maintained it had produced "the entirety of the ISTAR report" and, when the trial court asked whether other documents related to the investigation had not been produced, she explained, "There is more information from the Los Angeles School Police Department that is essentially a police report." The trial court asked why these materials had not been produced, and defense counsel answered, "Because my understanding was we were supposed to produce the ISTAR report." The trial court said this was "not a correct understanding," emphasized it was "very concerned" about surprise and undue prejudice, and underscored it "want[ed] to see whether there was a good faith basis to raise this in front of the jury." The trial court was "not convinced there was a good faith basis to raise [the issue]," and warned defense counsel this was not "the time . . . to be cutting it narrowly [as to] what you think you want to share with the court."

Defense counsel asked the court to review additional materials in camera before ordering their disclosure, and the trial court asked for further explanation. Defense counsel said, "what it is is a letter that was two different letters [sic] that was written to LAUSD saying that a young girl had been raped and that she was thinking about committing suicide. When LAUSD got this

14

information, they then went to the police because they have to go through their own police department and then LAPD.  [¶]  They did a search to try to find a victim that met the information that was in this letter.  There was then a third letter saying why aren't you guys doing anything about this?  [Plaintiff] is doing this to other people.  [¶]  So I'm concerned that if it was turned over—I was also told this is not a cold case or a closed investigation with LAPD.  I'm concerned that if [plaintiff] is in anyway involved with that, that there could be—I'm concerned about protecting the students."  The trial court stated the "cat's out of the bag" and emphasized it was "not persuaded at this point that it was appropriate" for defense counsel to raise the issue before the jury, "[s]o this [was] not the time for defendant to take the position that there's a limited amount of information that [the court] should see."

Defendant produced additional documents related to the investigation.  One of the documents, a handwritten note, accuses plaintiff of raping her and indicates an office assistant witnessed the assault.  A typed, unsigned note expresses concern about the allegations and complains "[n]othing is being done, and people are afraid to report."  An LAUSD "Incident Report Form" indicates the letters were "sent to the attention of Superintendent, police and District officials which were then routed to Human [R]esources unit 15th floor."  Notes and correspondence prepared by investigators indicate they could not identify a victim and the office assistant denied witnessing any wrongdoing.  The Incident Report Form reflects the "Incident Status" was "Closed."  One investigator's notes describe a conversation with an administrator, Dr. Darneika Watson-Davis, who said that an office technician placed an unopened envelope

15

containing copies of the letters in her mailbox on the afternoon of May 31, 2016, but the envelope was not in her mailbox on June 1, 2016, and she found it on June 2, 2016, "opened and on top of other mail in her mailbox."

After disclosure of the documents, plaintiff moved for a mistrial "conditioned upon an award of sanctions for fees and costs . . . incurred to date for this trial only" and, in the alternative, that he be permitted to present rebuttal testimony addressing the accusation and "that the jury be instructed." Plaintiff argued defendant "engaged in prejudicial conduct by stating before the jury that [plaintiff] was accused of inappropriate sexual conduct with a student" and by "[r]epresenting to this court that there was an investigation that was still open . . . ." Plaintiff argued documents produced by defendant showed plaintiff was "never a suspect" and he was only questioned "as the victim of a misdemeanor called 'annoying letter.'" Plaintiff believed he was prejudiced because there was "no way that this jury [could] set [the accusation] aside."

Defense counsel explained she had "spoken to law enforcement regarding what was the status of this case before bringing it up" and she was told "it is an open investigation." The trial court interjected that, based on the LAUSD Incident Report Form, it was "not credible" that "somehow somebody is still looking into this 2016 incident." The court "f[ound] it disingenuous for counsel to represent to the court that it is somehow an ongoing investigation." The court stated it would need to review the reporter's transcript "to see exactly how this was done in front of the jury" to determine whether it was "fixable by some sort of instruction by the court."

The court later ruled that, "[w]hile inappropriate, defense counsel's conduct [did] not rise to the level of requiring a mistrial" and "the prejudicial effect of this testimony [could] be cured by an admonition." The court admonished the jury that "[e]arlier in the trial you heard testimony concerning an accusation that [plaintiff] had engaged in inappropriate conduct with a female student. [Plaintiff] denied the accusation and filed a complaint concerning that accusation. The accuser was never identified or found despite efforts by the LAPD to locate her. The supposedly corroborating witness denied seeing any such improper conduct. LAUSD closed the matter without taking any action against [plaintiff]. [¶] I have determined it is unnecessary for [plaintiff] to present any evidence to address this matter. [¶] You are instructed to disregard that accusation and any testimony about it."

### C.    *Jury Verdict and Post-Trial Motions*

The jury returned a verdict for plaintiff on the whistleblower retaliation cause of action and a verdict for defendant on the FEHA cause of action.

With respect to the whistleblower cause of action, the jury found plaintiff "disclosed a violation of law regarding illegal misuse of Title I funds to a person of authority over [him] or an employee with authority to investigate, discover, or correct such improper use"; plaintiff "reasonably believe[d] that he had disclosed a violation of the law regarding [defendant's] illegal misuse of Title I funds"; the disclosure was "a contributing factor in [defendant's] decision to accuse [plaintiff] of falsifying grades" and ultimately to terminate his employment; defendant would not have taken these actions for "legitimate, independent

17

reasons"; and defendant's conduct was a substantial factor in causing harm to plaintiff. With respect to the FEHA cause of action, the jury found plaintiff did "complain about racial comments by administrators against option school principals," but further found defendant did not "engage in conduct that, taken as a whole, materially and adversely affected the terms and conditions of [plaintiff's] employment."

The jury awarded plaintiff $2,500,000 in damages: $2,000,000 for past non-economic loss and $500,000 for future non-economic loss. The trial court entered judgment in January 2022.

Defendant thereafter moved for a new trial and for judgment notwithstanding the verdict (JNOV).[11] In its new trial motion, defendant argued there was insufficient evidence plaintiff had reasonable cause to believe he disclosed a violation of law or that he was terminated as a result of his disclosures, there was insufficient evidence to support future non-economic damages, the damages award was excessive, and the instruction concerning the elements of plaintiff's whistleblower retaliation claim should have specified the purported violations of "Title I" and "state law" at issue. In the JNOV motion, defendant repeated its arguments concerning the whistleblower retaliation cause of action and argued, in the alternative, that it was entitled to judgment notwithstanding the verdict because it had shown by clear and convincing evidence that it would have dismissed plaintiff based on a reasonable belief he falsified grades.

---

[11] Defendant also moved, unsuccessfully, to set aside or vacate the judgment on grounds that are not relevant to this appeal.

18

The trial court denied both defense motions. With respect to the new trial motion, the trial court determined there were no grounds to reduce the damages award, the jury "could find that [plaintiff's] belie[f] [that] the misuse of government funds is illegal [was] reasonable," the jury could reasonably infer causation from the fact that plaintiff was fired shortly after he raised concerns about Title I funds, and the evidence at trial supported the jury instructions. Ruling on the JNOV motion, the trial court reiterated there was sufficient evidence to support the whistleblower retaliation claim and defendant had not shown by clear and convincing evidence that it would have dismissed plaintiff for falsifying grades regardless of his whistleblowing activity.

In addition to the defense post-trial motions, plaintiff also moved for a new trial on his FEHA cause of action or, in the alternative, judgment in his favor and additur. He argued that defense counsel's questions concerning the rape accusation amounted to misconduct and an irregularity in the proceeding and he argued the distress caused by the false representation that plaintiff was the subject of an active investigation "[i]mpair[ed] his [a]bility to [t]estify." Plaintiff further argued defendant's failure to disclose the rape accusation and documents relating to the investigation deprived him of evidence relevant to his FEHA cause of action. Plaintiff additionally moved for sanctions against defendant and its attorneys for, among other things, raising the rape accusation before the jury and misrepresenting the status of the investigation to the court.

The trial court denied both of plaintiff's motions too. With respect to the new trial motion, the trial court emphasized it had sustained plaintiff's (eventual) objection to questions concerning

19

the rape allegation, found there was no reason to believe the jury ignored its robust curative instruction, found the assertion that plaintiff was "thrown off" did not warrant a new trial, and concluded the alleged discovery violation did not warrant a new trial because "it is undisputed [p]laintiff was aware of this incident." With respect to the motion for sanctions, the trial court determined plaintiff was not prejudiced by questions concerning the rape accusation, the court "addressed the issue during the trial," plaintiff "failed to establish that [d]efendant's actions were harassing or frivolous," and "the complained-of conduct does not rise to a level justifying sanctions . . . ."

## II. DISCUSSION

We need address only one of the several issues defendant raises on appeal. Section 1102.5, subdivision (b) prohibits an employer from retaliating against an employee "for disclosing information . . . if the employee has reasonable cause to believe that the information discloses a violation of [law] . . . ." Although a plaintiff need not establish an actual violation of law or cite any specific law in his or her disclosure, an unsupported hunch that the conduct disclosed *ought* to be illegal does not suffice. Here, plaintiff conceded at trial that he "[did] not know if there's a Title I regulation that requires funds to follow a student" and he remains unable to identify any rule, regulation, or statute even arguably requiring this. Plaintiff also presented no other evidence supporting the reasonableness of his belief that such a law exists. Defendant is therefore entitled to judgment notwithstanding the verdict on the whistleblower claim.

That conclusion does not resolve all we have been asked to decide because plaintiff contends he is entitled to a new trial on

20

the FEHA cause of action that the jury resolved in LAUSD's favor and he argues the trial court should have imposed monetary sanctions against defense counsel.  Neither argument has merit.  With respect to the new trial motion, the trial court did not err in concluding defendant's representations and disclosures concerning the sexual abuse investigation did not undermine the fairness of the trial.  As for sanctions, the trial court did not abuse its discretion when deciding sanctions were not required under the circumstances—including the robust curative instruction it gave during trial.

> ### A. There is No Evidence Plaintiff Had Reasonable Cause to Believe Defendant's Allocation of Title I Funds Violated Any Law
> #### 1. Legal framework

"On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict."  (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1138.)

Section 1102.5, subdivision (b) provides that "[a]n employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has reasonable cause to

21

believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

A disclosure within the meaning of section 1102.5, subdivision (b) need not reveal new information to the recipient. (*People ex rel. Garcia-Brower v. Kolla's, Inc.* (2023) 14 Cal.5th 719, 726.) A disclosure within the meaning of section 1102.5, subdivision (b) also need not be akin to a legal memo citing specific statutes. (*Ross v. County of Riverside* (2019) 36 Cal.App.5th 580, 592-593 [reversing summary judgment against a former prosecutor who alleged he was fired for recommending the dismissal of a criminal case because although he did not expressly cite "his belief continued prosecution would violate the defendant's due process rights as well as a prosecutor's ethical obligations under state law" to his superiors, the statute "does not require such an express statement. It requires only that an employee disclose information and that the employee reasonably believe the information discloses unlawful activity"].) Nevertheless, the disclosure here is still legally insufficient.

The statute requires a disclosing employee to have *reasonable cause* to believe the information disclosed would reveal a violation of law. (*Vatalaro v. County of Sacramento* (2022) 79 Cal.App.5th 367, 382.) Here, it is undisputed that *if* plaintiff had reasonable cause to believe he was disclosing violations of Title I, he also reasonably believed he was doing so.

In assessing whether an employee has reasonable cause to believe information discloses a violation of law, courts look to whether the employee is "'able to point to some legal foundation for his suspicion—some statute, rule or regulation which may

22

have been violated by the conduct he disclosed.  [Citation.]'
[Citation.]" (*Ross*, *supra*, 36 Cal.App.5th at 592; accord *Carter v.
Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922,
933-934 [holding that a plaintiff did not have reasonable cause to
believe his report that a colleague recommended a protein shake
to a student disclosed a violation of law because "[p]rotein shakes
containing creatine are not unlawful under either state or federal
law" and, "[c]onsequently, there is no reason to believe that
merely suggesting that a high school senior drink one at some
unspecified time in the future is *illegal*"].)  In other words,
although the employee need not cite any specific statute or
regulation *to their employer*, a finder of fact must have some
benchmark against which to assess reasonableness.  (*Kolla's*,
*supra*, 14 Cal.5th 719, 734 [explaining that the "reasonable cause
to believe" clause in the statute "imposes a requirement of
objective reasonableness and excludes from whistleblower
protection disclosures that involve only disagreements over
discretionary decisions, policy choices, interpersonal dynamics, or
other nonactionable issues"].)

In *Love v. Motion Industries, Inc.* (N.D.Cal. 2004) 309
F.Supp.2d 1128—cited approvingly in *Carter*, *supra*, 148
Cal.App.4th 922—the district court granted the defendant
employer's motion for summary judgment because the plaintiff
"argue[d] simply that he reasonably believed that the activity
violated some unnamed statute, rule, or regulation." (*Love*,
*supra*, 309 F.Supp.2d at 1135.)  The "[p]laintiff's silence [was]
telling and indicate[d] a lack of any foundation for the
reasonableness of his belief." (*Ibid.*)  The plaintiff's assertion
"that several OSHA standards may have been violated" did not

23

suffice where he "still could not point to any standard specifically." (*Id.* at 1135, fn. 5.)

### 2. *Analysis*[12]

Plaintiff contends he had reasonable cause to believe his complaints that Title I funds did not "follow" students who changed schools after the early school year norming day—and other issues downstream of this policy, including the lack of funds for live credit recovery programs—disclosed a violation of Title I. But plaintiff conceded at trial that he "do[es] not know if there's a Title I regulation that requires that." Plaintiff's respondent's brief does not succeed in filling in the gap. As before at the time of the disclosure and at trial, plaintiff still does not cite any rule, regulation, or statute proscribing the use of a norming day to allocate funds, specifying when the norming day must occur, requiring revision of allocations when students change schools, or requiring live credit recovery programs.[13] Like

---

[12] Plaintiff contends in a motion to strike portions of defendant's reply brief that defendant did not timely raise the issue of whether plaintiff's disclosures concern discretionary decisions as opposed to violations of law. Although defendant does quote relevant language from *Kolla's* for the first time in its reply—*Kolla's* was decided after defendant filed its opening brief—it adequately raised the issue in its opening brief. Indeed, plaintiff addressed the issue in his respondent's brief. The motion to strike and plaintiff's alternative request to file a supplemental brief are denied.

[13] Plaintiff's argument that defendant illegally "fail[ed] to transfer . . . students [to continuation high schools] until they

24

the plaintiff in *Love*, plaintiff relies on "unnamed statute[s], rule[s], [and] regulation[s]" and fails to identify "any standard specifically." (*Love, supra*, 309 F.Supp.2d at 1135; *id.*, fn. 5.)

The best plaintiff musters is the suggestion that defendant's allocation of Title I funds conflicts with high-level statements of purpose (e.g., 20 U.S.C. § 6301 ["The purpose of this subchapter is to provide all children significant opportunity to receive a fair, equitable, and high-quality education, and to close educational achievement gaps"]) or case law summarizing Title I's purpose (*Dept. of Education, State of Hawaii v. Bell* (9th Cir. 1985) 770 F.2d 1409, 1413 ["Title I was a 'massive' effort to break the 'link between economic privation and educational underachievement' in the nation"]).[14] It is not reasonable, however, to derive the narrow rules plaintiff contemplates from these general principles.[15] And framing the question as the trial

---

were juniors or seniors" also lacks any connection to a specific rule, regulation, or statute.

[14] Plaintiff's citation to 20 U.S.C. § 6314(a)(1)(A) for the proposition that a local education agency may use Title I funds for schoolwide programs so long as the school "serves an eligible school attendance area in which not less than 40 percent of the children are from low-income families, or not less than 40 percent of the children enrolled in the school are from such families" has no relevance here. There is no evidence or argument that plaintiff believed defendant's policies violated this subdivision.

[15] Plaintiff contends *Bell, supra,* supports his "reasonable suspicion that to comply with Title I, the funds must be used to benefit the students, and not merely the school in which they were enrolled on 'norming day' . . . ." He quotes, without context, *Bell*'s holding that "Title I requires that state and local funds actually be expended on Title I students rather than merely be

25

court did—i.e., whether the jury "could find that believing the misuse of government funds is illegal is reasonable"—assumes, without any basis, that plaintiff showed defendant's allocation of Title I funds was improper as opposed to (arguably) unwise.

Plaintiff's discussion of an apparent conflict between rising graduation rates and declining college matriculation, as well as Dr. Malkus's testimony concerning the efficacy of online credit recovery programs, is even weaker. It demonstrates, at most, that different approaches to allocating Title I funds *might* better serve *some* of Congress's goals. Plaintiff did not deploy graduation rates or Dr. Malkus's testimony in the service of construing any specific rule, regulation, or statute at trial, and he makes no effort to do so on appeal. That is for good reason: Dr. Malkus was critical of certain approaches to credit recovery, but he offered no opinion as to whether any specific approach is mandated or prohibited by law.[16]

---

available to those students." (*Bell*, *supra*, 770 F.2d at 1415.) *Bell* is inapposite. The quoted language appears in a discussion of whether Hawaii's use of Title I funds to support special programs *that did not also receive state funding* violated the statutory requirement that Title I funds must supplement (and not supplant) state funding to Title I students. (*Id.* at 1414-1415.) *Bell* does not address norming days or whether Title I funds must be re-allocated during the school year when students change schools.

[16] Dr. Malkus acknowledged that although he has "expertise in school finance" and "do[es] a lot of work with Title I funding and so forth," he has no expertise concerning "how Title I flows to LAUSD schools."

Even taking plaintiff's argument on its own terms, his broad appeal to Title I's purpose unreasonably assumes Congress left no room for discretion in addressing issues like students changing schools in the middle of the school year.[17]  Plaintiff's argument, like his testimony, amounts to an assertion about what he believes Title I ought to require as opposed to what it actually requires.  This is precisely the sort of "disagreement[ ] over . . . policy choices" that section 1102.5, subdivision (b) excludes from whistleblower protection.  (*Kolla's*, *supra*, 14 Cal.5th at 734.)  Judgment for LAUSD on plaintiff's whistleblower claim is required.

### B.	The Trial Court Did Not Err In Denying Plaintiff's Motion for New Trial on the FEHA Claim

"We will not disturb the trial court's determination of a motion for a new trial unless the court has abused its discretion. [Citation.]  When the court has denied a motion for a new trial, however, we must determine whether the court abused its discretion by examining the entire record and making an independent assessment of whether there were grounds for granting the motion.  [Citation.]"  (*ABF Capital Corp. v. Berglass* (2005) 130 Cal.App.4th 825, 832.)  "To the extent that the trial court confronted conflicting declarations in denying the new trial motion, we affirm the trial court's factual determinations, whether express or implied, if supported by substantial evidence.

---

[17]	We caution that we do not decide whether defendant's allocation of Title I funds complies with federal and state law.  The question before us is whether plaintiff presented substantial evidence that he had reasonable cause to believe it does not.

[Citations.]"  (*Sandoval v. Los Angeles County Dept. of Public Social Services* (2008) 169 Cal.App.4th 1167, 1176, fn. 6.)

Plaintiff moved for a new trial on his FEHA cause of action based on an irregularity in the proceedings that, he says, prevented him from having a fair trial.  (Code Civ. Proc., § 657, subd. (1).)  He contends defense counsel's representation that he was the subject of an ongoing investigation into sexual misconduct hampered his ability to testify, and he asserts defendant's failure to disclose the investigation and relevant documents deprived him of evidence of retaliation.  Neither argument has merit.

The trial court was not persuaded that plaintiff was somehow "thrown off" by the discussion of the 2016 investigation. Plaintiff, though, argues the trial court gave short shrift to his declaration in which he averred he "[i]nitially . . . did not comprehend the sexual assault accusations related to 2016 and the anonymous letter."  This argument is belied by the trial transcript.

Defense counsel broached the issue with Dr. Placencio by asking whether he was aware of LAPD contacting plaintiff "months before the false grade investigation."  Dr. Placencio understood defense counsel to be referring to the note accusing plaintiff of misconduct "in cahoots" with another staff member and emphasized he was present when a police officer assured plaintiff the accusation appeared to be unfounded.  Defense counsel's subsequent representation that the investigation remained "open"—in support of the argument that defendant should not be required to produce unredacted documents—did not suggest there was a separate incident or new evidence against plaintiff.

Plaintiff alternatively argues defendant's failure to produce documents relating to the 2016 investigation deprived him of evidence of "a pattern of escalating retaliation against him." The argument is not entirely clear. Plaintiff at times appears to suggest the rape accusations *constitute* retaliation despite there being no "adverse action by the employer." (*Brown v. Los Angeles Unified School District* (2021) 60 Cal.App.5th 1092, 1105 [discussing elements of FEHA retaliation claim].) The most generous reading of his argument, however, is that decision-makers should have been aware that someone "had an axe to grind with [plaintiff]" and taken a more skeptical approach to the allegations of grade falsification.

Plaintiff's theory is impermissibly speculative. Plaintiff infers from investigation notes indicating letters were apparently removed from and later returned to Dr. Watson-Davis's mailbox that an LAUSD employee must have written the letters. He further argues Dr. Perkins, who thanked police for an email update on the investigation, had a "particular interest" in the matter. If the letters were already in Dr. Watson-Davis's mailbox, however, it is not clear what additional mischief plaintiff believes the sender engaged in by tampering with them.[18] And Dr. Perkins's email—which reads, in its entirety, "Thank you Chief"—could not be more innocuous. Nothing in these disclosures supports an inference that defendant should have suspected Moreno's conduct or CIF's questions concerning

---

[18] Alternatively, if the theory is that the sender inserted the notes into envelopes already in Dr. Watson-Davis's mailbox, this adds a risky and wholly unnecessary step to the straightforward task of defamation-by-mail.

student grades were part of a broader campaign against plaintiff—certainly no more so than the bare fact of the rape accusation, which was already known to plaintiff.[19]

Plaintiff's new trial motion was correctly denied, and we accordingly need not consider his argument for additur as "an alternative remedy to a new trial."

### C. *The Trial Court Did Not Abuse Its Discretion in Declining to Sanction Defense Counsel*

The scope of plaintiff's challenge to the trial court's order denying sanctions against defendant's trial counsel is not clear. A heading in plaintiff's opening brief argues that "[s]anctions should have been imposed for [defendant's] discovery abuses and introduction of false rape allegations." But a footnote attached to this heading suggests a narrower argument: "Plaintiff's appeal of the sanctions order is limited to the court's order denying sanctions for [defendant's] . . . misconduct in introducing false evidence of [plaintiff's] purported sexual misconduct with students." Yet plaintiff argues in his reply brief that sanctions were warranted by defendant's claimed discovery abuses. Whatever the precise scope of the argument, the trial court acted within its discretion in declining to impose sanctions. (*Wallis v. PHL Associates, Inc.* (2008) 168 Cal.App.4th 882, 893 [abuse of discretion is the governing standard of review].)

---

[19] The significance of plaintiff's observation that "[t]he rape allegations, and accompanying emails [were] printed/accessed" by someone at LAUSD in April 2017 is unclear. His argument is that defendant should have paid greater attention to a previous false claim against him, not that decision-makers improperly considered it.

30

Plaintiff cites several bases for an award of sanctions against defense counsel, but he relies principally on Code of Civil Procedure section 128.5 (Section 128.5) and Code of Civil Procedure section 575.2 (Section 575.2). Section 128.5, subdivisions (a) and (f) authorize a court to impose sanctions for, among other things, "actions or tactics, made in bad faith, that are frivolous . . . ." "'Frivolous' means totally and completely without merit or for the sole purpose of harassing an opposing party." (Code Civ. Proc., § 128.5, subd. (b)(2).) Section 575.2, subdivision (a) authorizes a court to impose sanctions pursuant to applicable local rules. Los Angeles County Superior Court Local Rule 3.10 provides for sanctions for violation of local civil division rules, and Local Rule 3.107 requires a party to confer with opposing counsel and the court prior to "inquiring into evidence which may reasonably be anticipated to be inflammatory or highly prejudicial . . . ."[20]

We will assume just for analytical purposes that plaintiff's questions to Dr. Placencio were frivolous and defense counsel violated Local Rule 3.107 by failing to first raise the issue outside the presence of the jury. These assumptions still do not establish the trial court abused its discretion in declining to sanction defense counsel. It was within the trial court's discretion to conclude a strong instruction would be sufficient to cure any prejudice to plaintiff. The instruction it gave—underscoring

---

[20] Plaintiff also cites to California Rules of Court, Rule 2.30, which provides for sanctions for violations of the California Rules of Court, but he does not discuss any relevant substantive rules. Plaintiff's citations to Business and Professions Code section 6068, which defines the duties of an attorney, are not linked to any basis for sanctions.

31

LAPD's failure to locate the alleged victim, the "supposedly corroborating witness['s]" denial of any abuse, LAUSD's closure of the matter, and the trial court's own determination that it was "unnecessary" for plaintiff to address the matter—was unambiguous and thorough. Plaintiff's contention that purported discovery violations necessitated sanctions fails because, as we have earlier summarized, the documents at issue did not support plaintiff's claims.

Plaintiff still protests that the trial court improperly limited its analysis of the harm caused by defense counsel's conduct to the trial itself. Specifically, he suggests the court should have considered "reputational damage that cannot be redressed because of the litigation privilege" arising from plaintiff's purportedly mandatory disclosure of the investigation to his current employer. Even if sanctions would have been an appropriate remedy for such harm, there was no concrete evidence of reputational harm before the trial court. The trial court gave appropriate weight to all relevant circumstances.

## DISPOSITION

The judgment is reversed as to the section 1102.5 cause of action, the order denying defendant's motion for JNOV is reversed, and the orders awarding plaintiff attorney fees and costs are vacated. The orders denying plaintiff's motions for a new trial on the FEHA cause of action and for sanctions are affirmed. On remand, the trial court is directed to enter a new and different order granting defendant's JNOV motion on the section 1102.5 claim and to enter judgment for defendant accordingly. Defendant's appeal of the order denying in part its motion to tax costs is dismissed as moot. Defendant is awarded costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

BAKER, J.

We concur:

HOFFSTADT, P. J.

MOOR, J.

33